**ALLENDALE MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**EXCESS INSURANCE COMPANY, LTD. et al., Defendants.**

**No. 95 CIV. 10970(SAS).**

United States District Court, S.D. New York.

Aug. 19, 1997.

---

Bernard London, James L. Fischer, James Walsh, London & Fischer, New York, NY, for Plaintiff.

Richard A. Walker, Jeffrey E. Margulis, Kaplan, Begy & Von Ohlen, Chicago, IL, Robert J. Brown, Chalos & Brown, New York, NY, for Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

In this diversity action, plaintiff Allendale Mutual Insurance Company ("Allendale") seeks to recover $7,000,000 in unpaid reinsurance, $5,000,000 in "loss adjustment expenses" and interest, and an unspecified amount for legal fees and expenses incurred in the defense of a prior action for declaratory relief brought by defendants against Allendale in England. On July 8, 1997, I dismissed plaintiff's claim for loss adjustment expenses pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Allendale Mutual Ins. Co. v. Excess Ins. Co., Ltd.,* 970 F.Supp. 265 (S.D.N.Y.1997) (*"Allendale I "*). Plaintiff now moves for reargument pursuant to Local Rule 6.3. For the reasons set forth below, plaintiff's motion for reargument is granted. However, after considering reargument of this issue and partially amending the July 8 Opinion and Order in light of such, I again find that plaintiff's claim for loss adjustment expenses must be dismissed pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### I. Factual Background

The factual and procedural history of this action were set forth in *Allendale I,* 970 F.Supp. 265, 267–268 and familiarity with both will be presumed for purposes of this Opinion and Order.

### II. Motion for Reargument

■ Local Civil Rule 6.3 states in pertinent part:

A notice of motion for reconsideration or reargument shall be served within ten (10) days after the docketing of the court's determination of the original motion and . . . shall be served with . . . a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked. . . . No oral argument shall be heard unless the court grants the motion and specifically directs that the matter shall be reargued orally. No affidavits shall be filed by any party unless directed by the court.

Local Civil Rule 6.3. To satisfy this rule, the moving party must set forth a matter or controlling decision overlooked by the court in its initial review of the motion. *See Farkas v. Ellis,* 783 F.Supp. 830, 832 (S.D.N.Y.) ("The standard for granting a motion for reargument is strict in order to preclude repetitive arguments on issues that have already been considered fully by the court."), *aff'd,* 979 F.2d 845 (2d Cir.1992). "[T]he court must not allow a party to use the motion to reargue as a substitute for appealing from a final judgment." *Fulani v. Brady,* 149 F.R.D. 501, 503 (S.D.N.Y.1993), *aff'd,* 35 F.3d 49 (2d Cir.1994). If the court finds the motion for reargument is warranted, the court may either direct the parties to reargue their motions orally or rely on the submissions as made. *See New York City Department of Finance, et al. v. Twin Rivers, Inc.,* 929 F.Supp. 172, 173 (S.D.N.Y.1996). The decision to grant or deny a motion to reargue rests in the discretion of the district court. *See Cohen v. Koenig,* 932 F.Supp. 505, 507 (S.D.N.Y.1996).

■ Defendants now contend that plaintiff's motion for reargument must be denied as plaintiff has raised no factual matters or controlling decisions overlooked by the court. In one sense, defendants are correct: plaintiff's current arguments are but an expanded version of those initially raised in their memorandum of law submitted in opposition to defendants' motion. However, the July 8 Opinion and Order did not directly address these arguments, and it appears that they raise important legal questions that have yet to be addressed by any Court of Appeals. Accordingly, plaintiff's motion for reargument is granted in order to present a more thorough explanation of my decision to dismiss plaintiff's claim for loss adjustment expenses pursuant to Rule 56.

## III. Discussion

### A. The Question Presented

As stated in the July 8 Opinion and Order, the viability of plaintiff's claim for loss adjustment expenses turns on a single legal question: can the follow-the-settlement clause [1] of the reinsurance agreement serve as a basis for Allendale to recover loss adjustment expenses in excess of the $7,000,000 cap set forth in the limit clause [2]? Stated another way, the question presented is whether the limit clause defined the reinsurers' maximum exposure as $7,000,000 inclusive of all loss adjustment expenses.

### B. The July 8 Opinion and Order

My decision to dismiss plaintiff's claim for loss adjustment expenses rested on three primary grounds, which I reiterate briefly to place plaintiff's current arguments in context.

First, fundamental contract law requires the parties' intent to be discerned by reading the contract as a whole, and by considering all its clauses together to determine if and to what extent one may modify, explain or limit another. "From this it follows that a contract containing two clauses which may be in conflict should, if possible, be read to give meaning to both rather than to prefer one to the exclusion of the other." *See Allendale I,* 970 F.Supp. at 269. As nothing expressly indicates that the parties intended the follow-the-settlement clause to supersede the limit clause under any circumstance, the contract as a matter of law could only be read to mean that the limit clause capped the reinsurers' liability inclusive of Allendale's loss adjustment expenses. *See id.*

Second, "[t]his reading of the reinsurance agreement is buttressed by an understanding of the traditional role of follow-the-settlement clauses in the reinsurance industry." Leading treatises note that the purpose of follow-the-settlement clauses is " 'to preclude wasteful relitigation by a reinsurer of defenses to underlying policy coverage in cases where the ceding insurer has in good faith paid a settlement or judgment' " and that "[f]ollow-the-settlement clauses have not traditionally served to modify or eliminate the limit of the reinsurer's exposure." *See id.* at 270 (quoting Barry R. Ostrager and Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 16.01 at 658 (7th ed.1994)). *See also* Henry T. Kramer, "The Nature of Reinsurance" *in Reinsurance* 12–13 (Robert W. Strain, ed. 1980) ("It is clear that [a follow-the-fortune clause] does not supersede stated limitations or exclusions in a reinsurance agreement.... In a word, the concept of follow fortunes cannot create reinsurance where none exists.")

Third, both *Bellefonte Reinsurance Co. v. Aetna,* 903 F.2d 910 (2d Cir.1990) and *Unigard Security Ins. Co. v. North River Ins. Co.,* 4 F.3d 1049 (2d Cir.1993) rejected the proposition that a follow-the-settlement clause requires a reinsurer to pay for defense costs in excess of the reinsurer's express reinsurance limit. The primary grounds for both cases was the determination that "the insurer's proposed interpretation effectively read the limit clauses out of the reinsurance contracts." *Allendale I,* 970 F.Supp. at 270.

### C. Plaintiff's Reargument

On reargument, plaintiff presents two related arguments that I will briefly describe below. First, plaintiff contends the Court overlooked the affidavits of Paul C. Thomson, former Vice President of Sorema N.A. Reinsurance Co., dated May 5, 1997 (the "Thomson Aff."), and of John J. Pomeroy, Vice President of Allendale, dated May 5th, 1997 (the "Pomeroy Aff."). It is plaintiff's position that these affidavits create a genuine issue of material fact as to the proper interpretation of the limit and follow-the-settlement clauses. The July 8 Opinion and Order did not address this argument.

---

1. The follow-the-settlement clause states: "Reinsurers agree to follow the settlements of the Reassured in all respects and to bear their proportion of any expenses incurred, whether legal or otherwise, in the investigation and defense of any claim hereunder."

2. The limit clause states: *"LIMIT:* US$ 7,000,-000 any one occurrence p/o US$13,500,000 any one occurrence excess of US$ 25,000,000 any one occurrence."

Second, plaintiff argues that *Bellefonte* and *Unigard* must be distinguished because both cases involved liability insurance, whereas this case involves a property insurance policy. Plaintiff argues that because Allendale reinsured a property insurance policy that did not include coverage of the insured's defense costs, the reinsurers' duty to reimburse Allendale for possible loss adjustment expenses must as a matter of law be considered to be an obligation distinct from the risk it accepted with regard to the insured property—and thus not subject to the limit clause. *See* Plaintiff's Memorandum of Law in Support of Motion for Reargument ("Plaintiff's Memo") at 8. Or in the alternative, plaintiff argues, the reinsurance agreement is ambiguous on this issue and therefore the parties' intent must be determined at trial. The July 8 Opinion and Order briefly discussed this argument, finding that "[t]hese arguments rely on the kind of 'idiosyncratic factors' that *Unigard* teaches should not be considered in determining whether a follow-the-settlement clause may extend a reinsurer's liability beyond the stated liability limit". *See Allendale I*, 970 F.Supp. at 271 (quoting *Unigard*, 4 F.3d at 1071).

### D. The Thomson and Pomeroy Affidavits

Plaintiff offers the Thomson and Pomeroy affidavits as extrinsic evidence of the parties' intent with regard to the intended meaning of the limit and follow-the-settlement clauses. In the alternative, plaintiff contends these affidavits are extrinsic evidence of the ambiguity of the reinsurance agreement. Before addressing these arguments, it is necessary to review fundamental principles of contract law.[3]

■■■ "The determination of whether a contract term is ambiguous is a threshold question of law for the court." *Walk-in Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987). *See also MBL Life Assurance Corp. v. 555 Realty Co. .*, 658 N.Y.S.2d 122, 123 (2d Dep't 1997). Contract terms are ambiguous if they are:

capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir.1996) (citation and quotation omitted). It is well established that when the text of a contract is clear on its face, the court should interpret its meaning as a matter of law. *See id.* Also, "[s]ummary judgment is not limited to ... where the contract is free from ambiguity and not subject to differing interpretations. If there is ambiguity in the terminology ... and the equivocality can be resolved without reference to extrinsic evidence, the issue is ... a question of law for the court". *See Gitlen v. Margaret G. T. Gallup*, 241 A.D.2d 856, 660 N.Y.S.2d 500, 502 (3d Dep't 1997) (citing *Maio v. Gardino*, 184 A.D.2d 872, 585 N.Y.S.2d 529, 530 (3d Dep't 1992)).

For reasons already explained in *Allendale I*, plaintiff cannot avoid summary judgment of its claim for loss adjustment expenses by presenting "objective" extrinsic evidence of the reinsurance industry's customs and practice. I have already found that "the contract *as a matter of law* could only be read to mean that the limit clause capped the reinsurers' liability inclusive of Allendale's loss adjustment expenses." *Allendale I*, 970 F.Supp. at 271 (emphasis added). Allendale's proposed interpretation of the reinsurance agreement was rejected because it effectively nullified the limit clause. *See Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assoc.*, 63 N.Y.2d 396, 482 N.Y.S.2d 465, 468, 472 N.E.2d 315, 317–318 (1984) ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless") (citations omitted); *see also Bellefonte*, 903 F.2d at 912 (citing *Spencer, White & Prentis, Inc. v. Pfizer Inc.*, 498 F.2d 358, 363 n. 23 (2d Cir.1974)). This conclusion was supported

---

3. The parties have not addressed the question of the applicable rules of decision in this case. Because federal common law and New York law are virtually identical with regard to the proper use of extrinsic evidence to determine whether a contract term is ambiguous, I will refer to both.

by the reasoning of both *Bellefonte* and *Unigard*, discussed at greater length below.

■ In a purely semantic sense, the Reinsurance Agreement is ambiguous as to whether the follow-the-settlement clause is capped by the limit clause. Yet the cases cited above make clear that when a contract is capable of being interpreted one of two ways, courts must choose that meaning which gives effect to all the contract's clauses rather than one that renders part of the contract meaningless. *See Newmont Mines Limited v. Hanover Ins. Co.* 784 F.2d 127, 135 (2d Cir.1986); *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 898, 305 N.E.2d 907, 909–10 (1973); Restatement (Second) of Contracts § 203(a). Because only defendants' proposed interpretation gives effective meaning[4] to the limit clause, plaintiff's claim for loss adjustment expenses must be dismissed. No extrinsic evidence of industry practice or custom can avoid such a result. Put simply, plaintiff cannot use affidavit testimony to create a question of fact regarding the proper interpretation of the reinsurance agreement when only one interpretation is permitted by law.

### E. The Distinction Between Liability and Property Insurance

Plaintiff strives to distinguish *Bellefonte* and *Unigard*. Its arguments require careful consideration because they raise what appears to be a question of first impression.

■ In *Bellefonte*, the Court of Appeals was required to interpret a limit clause and a follow-the-settlement clause that were almost identical to those at issue here. Specifically, those clauses provided:

[Provision 2]. Reinsurance Accepted: $500,000 part of $5,000,000 excess of $10,000,000 excess of underlying limits...

[Provision 4]. All claims involving this reinsurance, when settled by the [Insurer], shall be binding on the Reinsurer, which shall be bound to pay its proportion of such settlements, and in addition thereto... its proportion of expenses ... incurred by the [Insurer] in the investigation and settlement of claims or suits...."

*Bellefonte*, 903 F.2d at 911. As in this case, the insurer in *Bellefonte* sought more than $5,000,000 from its reinsurers in excess of the limits set in Provision 2. Rejecting the insurers' argument that "a 'follow the fortunes' clause can render a reinsurer liable for an amount in excess of the bargained-for coverage", the *Bellefonte* court ruled that Provision 2 defined the cost-inclusive limit of the reinsurers' total liability. *Id.* at 913 ("We hold that the district court correctly read the first two provisions of the reinsurance certificates to cap the reinsurers' liability, and that the 'follow the fortunes' doctrine does not allow [Insurer] to recover defense costs beyond the express cap stated in the [reinsurance agreement]"). The most faithful reading of *Bellefonte* indicates that its holding established as a rule of law that a follow-the-settlement clause cannot be interpreted to supplant the "excess of loss" liability cap[5] stated in a limit clause unless that intention is expressly stated in the reinsurance contract.

Three years later, the Court of Appeals ruled once again that excess of loss limit clauses cap the reinsurers' total liability under the reinsurance agreement, and that "[a]ll other contractual language must be construed in light of that cap". *See Unigard*, 4 F.3d at 1071. The *Unigard* court rejected the argument that evidence of the reinsurers' past practices of paying costs over the liability cap could be used as evidence of the parties' intent regarding the limit clause, and held that "*Bellefonte*'s gloss upon the written agreement is conclusive." *Id.*

---

4. Plaintiff's argument is centered on convincing the Court that the limit clause has "meaning" even if it is interpreted to exclude defense costs. Yet such an interpretation would not serve to limit defendants' exposure, as they would then face potentially unlimited liability under the Reinsurance Agreement.

5. Reinsurance agreements on individual risks are of either the proportional (pro rata) variety or of the non-proportional (excess of loss) variety. Under the latter form, the reinsurer agrees to reimburse the insurer if a loss on that risk exceeds a certain amount. *See* Robert A. Baker, "The Purpose of Reinsurance" *in Reinsurance* 42–43 (Robert W. Strain, ed.1980).

Plaintiff has not cited any case, treatise or law review article that supports its argument. My own research has revealed no indication that limit clauses in reinsurance agreements covering property insurance policies should be treated differently than limit clauses in reinsurance agreements covering liability policies. Moreover, plaintiff's argument that the limit clause does not pertain to defense costs because the insurer had no contractual obligation to the insured to incur those costs finds no support in the reasoning of the *Bellefonte* or *Unigard* decisions.

 Both found the limit clauses evinced a bargained-for intent to cap the reinsurers' total exposure to risk, and therefore rejected a contractual interpretation that effectively exposed the reinsurers to unlimited liability. The dispute in this case presents a similar problem of contractual interpretation. Whether defendants reimburse Allendale for claims for property losses or defense costs makes no difference to them. Reinsurers of property insurance policies have the same interest in controlling their maximum exposure as do reinsurers of liability insurance policies. Thus *Bellefonte* and *Unigard*'s holdings that the limit clauses define the reinsurers' bargained-for maximum exposure to liability inclusive of all costs and expenses are applicable even where the underlying insurance policy does not oblige the insurer to cover the insured's defense costs.

The Reinsurance Agreement in dispute was signed after *Bellefonte* was decided. As Allendale is a large and sophisticated insurance company, the law presumes it had access to legal counsel before agreeing to enter into that contract. Given that *Bellefonte* unequivocally held that the excess-of-loss limit clause defined the reinsurers' overall liability, Allendale should have bargained for contractual language that expressly excluded defense costs from the restrictions of the limit clause if indeed such was its intent. Conversely, defendants were entitled to rely on *Bellefonte*'s interpretation of the limit clause when they signed the Reinsurance Agreement.

The July 8 Opinion and Order stated that the distinction between property insurance policies and liability insurance policies was merely a kind of "idiosyncratic factor[ ]" that should not be considered in determining the question presented by Allendale's claim for loss adjustment expenses. *See Allendale I,* 970 F.Supp. at 271. Upon reconsideration of plaintiff's arguments, this distinction is not so much "idiosyncratic" as it is irrelevant to the parties' dispute over the meaning of their contract. I recognize that property insurance policies do not typically obligate the insurer to pay for the insured's defense costs, whereas liability policies typically do so obligate the insurer. Nevertheless, for the reasons discussed above, this fact does not distinguish the Second Circuit's prior holdings regarding excess of loss limit clauses used in reinsurance agreements.

In fairness to plaintiff's arguments, it should be observed that no Court of Appeals has yet interpreted an excess of loss limit clause in a reinsurance contract covering a cost-exclusive property insurance policy. Because of the inherent complexities of the reinsurance industry and the short-hand manner in which reinsurance agreements are traditionally drafted, the question presented here may well remain the subject of litigation in this circuit and others.

## IV. Conclusion

For the foregoing reasons, plaintiff's motion for reargument is granted. Upon reargument, the July 8 Opinion and Order is partially amended to incorporate the above discussion. However, I again find that plaintiff's claim for loss adjustment expenses must be dismissed pursuant to Rule 56 of the Federal Rules of Civil Procedure.

SO ORDERED.