[822 NE2d 768, 789 NYS2d 461]

EXCESS INSURANCE COMPANY LTD. et al., Respondents, v FACTORY MUTUAL INSURANCE COMPANY, Formerly Known as ALLENDALE MUTUAL INSURANCE COMPANY, Appellant.

Argued October 13, 2004; decided December 2, 2004

## POINTS OF COUNSEL

*London Fischer LLP,* New York City (*Bernard London, James L. Fischer* and *James Walsh* of counsel), for appellant. I. A property reinsurance contract should not be interpreted by reference to liability insurance precedents. (*Bellefonte Reins. Co. v Aetna Cas. & Sur. Co.,* 903 F2d 910; *Unigard Sec. Ins. Co., Inc. v North Riv. Ins. Co.,* 4 F3d 1049; *Great N. Ins. Co. v Mount Vernon Fire Ins. Co.,* 92 NY2d 682; *Becarie v Union Bank of Switzerland,* 272 AD2d 162; *Port Auth. of N.Y. & N.J. v Affiliated FM Ins. Co.,* 311 F3d 226; *Ryan v Royal Ins. Co. of Am.,* 916 F2d 731; *Allendale Mut. Ins. Co. v Excess Ins. Co.,* 992 F Supp 271, 62 F Supp 2d 1116; *Commercial Union Ins. Co. v Seven Provinces Ins. Co., Ltd.,* 217 F3d 33, 531 US 1146; *Kass v Kass,* 91 NY2d 554; *Aetna Cas. & Sur. Co. v Home Ins. Co.,* 882 F Supp 1328.) II. Alternatively, the reinsurance agreement is ambiguous as a matter of law. (*Sumitomo Mar. & Fire Ins. Co. v Cologne Reins. Co. of Am.,* 75 NY2d 295; *United Fire & Cas. Co. v Arkwright Mut. Ins. Co.,* 53 F Supp 2d 632; *Eskimo Pie Corp. v Whitelawn Dairies, Inc.,* 284 F Supp 987; *Menke v Glass,* 898 F Supp 227; *Canusa Corp. v A & R Lobosco, Inc.,* 986 F Supp 723; *Board of Mgrs. of Yardarm Condominium II v Federal Ins. Co.,* 247 AD2d 499; *Preminger v Columbia Pictures,* 49 Misc 2d 363, 25 AD2d 830, 18 NY2d 659; *Fox Film Corp. v Springer,* 273 NY 434; *Franklin Sugar Ref. Co. v Lipowicz,* 247 NY 465; *Newhall v Appleton,* 114 NY 140.)

*Kaplan & von Ohlen,* Chicago, Illinois (*Richard A. Walker,* of the Illinois Bar, admitted pro hac vice of counsel), and *D'Amato & Lynch,* New York City (*Jan H. Duffalo* of counsel), for

respondents. I. The reinsurance agreements "limit" of $7,000,000 caps plaintiffs-appellants' entire liability to defendant-respondent Factory Mutual Insurance Company. (*West 56th St. Assoc. v Greater N.Y. Mut. Ins. Co.*, 250 AD2d 109; *Sanabria v American Home Assur. Co.*, 68 NY2d 866; *Rhodes v Newhall*, 126 NY 574; *Bracher v Equitable Life Assur. Socy.*, 186 NY 62; *Allendale Mut. Ins. Co. v Excess Ins. Co., Ltd.*, 970 F Supp 265, 992 F Supp 271; *Ruttenberg v Davidge Data Sys. Corp.*, 215 AD2d 191; *Unigard Sec. Ins. Co. v North Riv. Ins. Co.*, 79 NY2d 576; *Bellefonte Reins. Co. v Aetna Cas. & Sur. Co.*, 903 F2d 910; *Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583; *Christiania Gen. Ins. Corp. of N.Y. v Great Am. Ins. Co.*, 979 F2d 268.) II. The courts below correctly determined, as a matter of law, that the reinsurance agreement at issue is unambiguous. (*Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.*, 32 NY2d 285; *Unisys Corp. v Hercules Inc.*, 224 AD2d 365; *West, Weir & Bartel v Mary Carter Paint Co.*, 25 NY2d 535; *Ruttenberg v Davidge Data Sys. Corp.*, 215 AD2d 191; *Airco Alloys Div., Airco Inc. v Niagara Mohawk Power Corp.*, 76 AD2d 68; *Bethlehem Steel Co. v Turner Constr. Co.*, 2 NY2d 456; *United Fire & Cas. Co. v Arkwright Mut. Ins. Co.*, 53 F Supp 2d 632; *Menke v Glass*, 898 F Supp 227; *Canusa Corp. v A & R Lobosco, Inc.*, 986 F Supp 723; *Board of Mgrs. of Yardarm Condominium II v Federal Ins. Co.*, 247 AD2d 499.)

## OPINION OF THE COURT

G.B. SMITH, J.

The issue presented by this appeal is whether respondents' obligation to pay sums for certain loss adjustment expenses arising from a "follow the settlements" clause is subject to the indemnification limit stated in a reinsurance policy. Like the Appellate Division, we conclude that it is, and therefore affirm the order of the Appellate Division.

In December 1990, appellant Factory Mutual Insurance Company (formerly known as Allendale Mutual Insurance Company) entered into an agreement with Bull Data Systems Inc. to provide property insurance with an indemnification limit of $48 million. Specifically, the policy covered against the risk of loss or damage to Bull Data's personal computer inventory stored in a warehouse located in Seclin, France. In turn, Fac-

tory Mutual obtained facultative reinsurance[1] from various London reinsurers which have severally subscribed to the reinsurance agreement at issue in this litigation. The reinsurance policy states, in pertinent part:

| | |
|---|---|
| "REASSURED: | ALLENDALE INSURANCE COMPANY |
| "ASSURED: | BULL DATA CORPORATION and/or as original. |
| "PERIOD: | Twelve months at 1st June, 1991 and/or as original. Both days inclusive. |
| "LOCATIONS: | Bull Data Corporation, Seclin, France as original. |
| "INTEREST: | Goods and/or Merchandise incidental to the Assured's business consisting principally of personal computers and/or as original. |
| "LIMIT: | US$ 7,000,000 any one occurrence p/o US$ 13,500,000 any one occurrence excess of US$ 25,000,000 any one occurrence. |
| "CONDITIONS: | As original and subject to same valuation, clauses and conditions as contained in the original policy or policies but only to cover risks of All Risks of Physical Loss or Damage but excluding Inventory Shortage. Including Strikes, Riots, Civil Commotions and Malicious Damage risks if and as original. Premium payable as in original. Reinsurers agree to follow the settlements of the Reassured in all respects and to bear their proportion of any expenses incurred, whether legal or otherwise, in the investigation and defence of any claim hereunder. Service of Suit Clause (U.S.A.). Insolvency Clause." |

In June of 1991, a fire that generated a spate of litigation, in

---

1. "Facultative reinsurance is policy-specific, meaning that all or a portion of a reinsured's risk under a specific contract of direct coverage will be indemnified by the reinsurer in the event of loss" (*Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583, 587 [2001]).

the United States and abroad, destroyed the warehouse. Bull Data presented a claim to Factory Mutual and, suspecting that the fire was the result of arson, Factory Mutual refused to satisfy it.

Bull Data brought suit in the courts of France to recover under its insurance policy. Factory Mutual also commenced an unsuccessful litigation against Bull Data in the United States District Court for the Northern District of Illinois, claiming that the loss was due to arson, and the limit of liability under the insurance policy was $48 million. After incurring approximately $35 million in litigation expenses, both lawsuits were terminated and Factory Mutual settled the claims with Bull Data for nearly $100 million.

Factory Mutual thereafter sought payment from respondent reinsurers. The reinsurers refused payment and filed an action in the courts of England seeking a declaration that the reinsurance contract was invalid. The English courts dismissed the case for lack of jurisdiction. During that period, Factory Mutual commenced a declaratory judgment action in the United States District Court for the District of Rhode Island seeking $7 million from the reinsurers and an additional $5 million in loss adjustment expenses, allegedly the proportionate share of expenses that the reinsurers owed Factory Mutual for having defended the Bull Data claim. Factory Mutual later discontinued the action upon stipulation and commenced a similar action in the United States District Court for the Southern District of New York.

District Judge Shira A. Scheindlin granted partial summary judgment to the reinsurers and dismissed Factory Mutual's claim for loss adjustment expenses (*Allendale Mut. Ins. Co. v Excess Ins. Co. Ltd.*, 970 F Supp 265 [SD NY 1997], *amended upon rearg* 992 F Supp 271 [SD NY 1997]). During the pendency of Factory Mutual's appeal to the United States Court of Appeals for the Second Circuit, that court decided an unrelated case which affected the subject matter jurisdiction of the pending case, resulting in dismissal of the appeal and vacatur of the judgment of the District Court (*Allendale Mut. Ins. Co. v Excess Ins. Co. Ltd.*, 62 F Supp 2d 1116 [SD NY 1999]).

The reinsurers thereafter commenced this declaratory judgment action in Supreme Court, New York County, seeking to annul the reinsurance agreement based on material nondisclosures and misrepresentations or, in the alternative, a judgment

awarding damages.[2] Factory Mutual interposed a counterclaim, seeking the $7 million indemnification limit under the reinsurance policy as well as $5 million in loss adjustment expenses incurred by Factory Mutual in the litigation of the original claim with Bull Data. Both Factory Mutual and the reinsurers moved for partial summary judgment on Factory Mutual's counterclaims seeking loss adjustment expenses in excess of the amount stated in the indemnification limit. Supreme Court denied the reinsurers' motion, granted Factory Mutual's cross motion and declared that the reinsurers' obligation to pay their proportionate share of the loss adjustment expenses was not subject to the stated indemnity limit of $7 million.

The Appellate Division reversed by granting the reinsurers' motion and denying Factory Mutual's cross motion. The Court thus declared that any portion of the loss adjustment expenses that the reinsurers were obligated to bear was subject to the $7 million limit stated in the reinsurance policy. The Appellate Division granted Factory Mutual leave to appeal to this Court. We now affirm the order of the Appellate Division.

In resolving the issue before us, we are mindful that in interpreting reinsurance agreements, as with all contracts, the intention of the parties should control. To discern the parties' intentions, the court should construe the agreements so as to give full meaning and effect to the material provisions (*see Breed v Insurance Co. of N. Am.*, 46 NY2d 351, 355 [1978]; *see also Greenfield v Philles Records, Inc.*, 98 NY2d 562, 569 [2002]; *Slatt v Slatt*, 64 NY2d 966, 967 [1985]).

Here, there is no dispute that the reinsurance agreements set the policy limit at $7 million per occurrence. The so-called "follow the settlements" clause is thereafter set forth in the section of the policy entitled "CONDITIONS."[3] As provided in the agreement, the clause requires the reinsurers to pay their por-

2. Factory Mutual moved Supreme Court to dismiss the action on the grounds of forum non conveniens and also commenced an action in the Superior Court of Providence, Rhode Island. Supreme Court granted Factory Mutual's motion. While the reinsurers appealed the order, they sought a preliminary injunction in Supreme Court to enjoin the Rhode Island proceeding, which that court denied. While the Rhode Island court was considering Factory Mutual's motion for partial summary judgment on its claims for loss adjustment expenses in excess of the indemnification limit, the Appellate Division reversed the order of Supreme Court, reinstated the reinsurers' lawsuit and enjoined the Rhode Island litigation.

3. In the reinsurance industry a "follow the settlements" clause "refers to the duty to follow the actions of the cedent in adjusting and settling claims"

tion of expenses incurred in the investigation and defense of any claim under the agreement. The reinsurers, however, contend that their liability to pay is subject to the $7 million cap negotiated under the policy. By contrast, Factory Mutual argues that the reinsurers' liability to pay the defense expenses is separate and apart from the indemnification cap on the policy.

We agree with the reinsurers and hold that they cannot be required to pay loss adjustment expenses in excess of the stated limit in the reinsurance policy. Once the reinsurers have paid the maximum amount stated in the policy, they have no further obligation to pay Factory Mutual any costs related to loss adjustment expenses. In so holding, we follow the decisions of the United States Court of Appeals for the Second Circuit as expressed in *Bellefonte Reins. Co. v Aetna Cas. & Sur. Co.* (903 F2d 910 [2d Cir 1990]) and *Unigard Sec. Ins. Co., Inc. v North Riv. Ins. Co.* (4 F3d 1049 [1993]). In both cases, the ceding insurers claimed that a similar "follow the fortunes" clause required the reinsurers to reimburse litigation costs beyond the stated limit in the policy. The court in both cases concluded that such a reading of the policy would render meaningless the liability cap negotiated in the policy. According to the *Bellefonte* court, to "allow[ ] the 'follow the fortunes' clause to override the limitation on liability—would strip the limitation clause and other conditions of all meaning; the reinsurer would be obliged merely to reimburse the insurer for any and all funds paid. . . . The 'follow the fortunes' clauses in the certificates are structured so that they coexist with, rather than supplant, the liability cap. To construe the certificates otherwise would effectively eliminate the limitation on the reinsurers' liability to the stated amounts" (903 F2d at 913).

Likewise here, the parties negotiated an indemnity limit of $7 million per occurrence. Thus, any obligation on the part of the reinsurers to reimburse Factory Mutual, whether it be for settling the original insurance claim with Bull Data or for the loss adjustment expenses incurred in the protracted litigation that ensued, must be capped by the negotiated limit under the policy. Otherwise, the reinsurers would be subject to limitless liability. Indeed, this case well illustrates such an injustice as Factory Mutual now seeks to saddle the reinsurers with a portion of a

(Barry R. Ostrager and Thomas R. Newman, 2 Handbook on Insurance Coverage Disputes § 16.01 [b], at 1020 [12th ed 2004]). Thus, the reinsurers will be bound by the settlement or compromise agreed to by the cedent unless they can show impropriety in arriving at the settlement (*id.*).

litigation bill that exceeds the negotiated policy limit by more than 70%.[4] To permit such a result would render the liability cap a nullity.

Factory Mutual asserts that this case is distinguishable from *Bellefonte* and *Unigard* in that those cases involved liability insurance while this case involves property insurance. According to Factory Mutual, a liability insurance product normally encompasses the obligation to pay the legal defense costs on behalf of the insured as well as the cost of the loss itself. Thus, the risk to be spread in reinsurance would already include loss adjustment expenses. However, a property insurance product would cover only the value of the property item to be insured. Under those circumstances, Factory Mutual contends, an insurer would have no contractual obligation to incur investigation or litigation costs and the risk of those costs is not already included in the reinsurance product. We find this argument unpersuasive and conclude that this distinction does not provide a sufficient basis to extend the reinsurers' liability beyond the limit stated in the reinsurance policy.

The limit clause in the policy is intended to cap the reinsurers' total risk exposure. Although Judge Scheindlin's decision in *Allendale* was vacated and is not binding, we find her reasoning persuasive, "Whether [the reinsurers] reimburse [Factory Mutual] for claims for property losses or defense costs makes no difference to them. Reinsurers of property insurance policies have the same interest in controlling their maximum exposure as do reinsurers of liability insurance policies. Thus, *Bellefonte* and *Unigard*'s holdings that the limit clauses define the reinsurers' bargained-for maximum exposure to liability inclusive of all costs and expenses are applicable even where the underlying insurance policy does not oblige the insurer to cover the insured's defense costs" (992 F Supp at 277).

Of course, both parties were well aware of the type of product that was being reinsured. It would be far from unreasonable to expect that at the time of procuring reinsurance, Factory Mutual could anticipate the possibility of incurring loss adjustment expenses in settling a claim from Bull Data. Certainly, nothing prevented Factory Mutual from insuring that risk either by expressly stating that the defense costs were excluded from the

---

4. Such an outcome would be particularly unfair given that the "follow the settlements" clause gave the reinsurers no control over the management of the unsuccessful litigation that Factory Mutual launched against Bull Data and no voice in limiting the $35 million litigation expense.

indemnification limit or otherwise negotiating an additional limit for loss adjustment expenses that would have been separate and apart from the reinsurers' liability on the insured property. Failing this, the reinsurers were entitled to rely on the policy limit as setting their maximum risk exposure.

Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

READ, J. (dissenting). I see no way to tell from the plain language of this certificate whether the parties intended for costs and expenses to be included in the reinsurance limit or excluded from it. Further, in my view the majority has misinterpreted *Bellefonte Reins. Co. v Aetna Cas. & Sur. Co.* (903 F2d 910 [2d Cir 1990]) in ways that augur further expansion of its much debated holding. Accordingly, I dissent.

## I.

The certificate pertains to reinsurance of a $13,500,000 layer ($25,000,000 to $38,500,000) of a $48,000,000 *property* insurance policy issued by Factory Mutual. Two provisions are at issue. The first provides that the "LIMIT" is "US$ 7,000,000 any one occurrence [part of] US$ 13,500,000 any one occurrence excess of US$ 25,000,000 any one occurrence."[1] The second notes several "CONDITIONS," including one whereby the certificate is made "subject to same valuation, clauses and conditions as contained in the original policy" (a "following form" provision) and one whereby "[r]einsurers agree . . . to bear their proportion of any expenses incurred" (a "follow the settlements" provision).

In essence, the majority concludes that the only reasonable interpretation of these provisions is that the policy contains a $7,000,000 limit (any one occurrence) which is cost-inclusive. This conclusion rests too heavily on the "follow the settlements" provision of the certificate, and fails to consider the "following form" provision. An equally plausible reading is that the parties, who "conditioned"[2] the certificate on the same "valuation, clauses and conditions" as exist in the primary *property* policy—

---

1. Sorema N.A. reinsured the remaining $6,500,000 of the $13,500,000 layer. Unlike Excess, Sorema paid up to its limit and also paid its proportion of costs.

2. The word "conditions" is not illuminative. Restatement (Second) of Contracts § 224 defines a condition as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a

where costs are commonly paid in addition to the policy limit[3] —could have intended to create a cost-exclusive reinsurance limit. Moreover, the parties did not expressly state that the limit was "subject to" the conditions and therefore capped all liability under the certificate (see e.g. *Bellefonte*). Because the certificate may reasonably be interpreted in either of two ways, I conclude that it is ambiguous (see *Evans v Famous Music Corp.*, 1 NY3d 452 [2004]).[4]

Moreover, I disagree with the majority's apparent reading of *Bellefonte*. In *Bellefonte*, Aetna issued primary and excess *liability* policies to A.H. Robins Co., the manufacturer of the Dalkon Shield. Aetna reinsured the excess policies with various reinsurers. After an "explosion" of litigation over the device, Aetna and Robins disputed the extent of Aetna's liability for defense expenses under the excess policies, and ultimately reached a monetary settlement in excess of the limit stated in the excess policy. Aetna then looked to the reinsurers for the excess paid on the underlying policy. The reinsurers refused to pay, arguing that their liability was limited by the reinsurance certificate.

The certificate stated that the reinsurance was provided "subject to the . . . amount of liability set forth herein" (903 F2d at 911). The court concluded that this created a cap on the reinsurers' liability whether reached through payment of expenses or settlement of claims. The Second Circuit reasoned that "[a]ny other construction of the reinsurance certificates would negate" the "subject to" provision of the certificate (*id.* at 914; see also *Unigard Sec. Ins. Co. v North Riv. Ins. Co.*, 4 F3d 1049

---

contract becomes due." As the Comments note, the term "condition" "is used with a wide variety of other meanings in legal discourse" (Restatement [Second] of Contracts § 224, Comment *a*).

3. The courts below did not determine whether or not this was the case here.

4. Indeed, the history of this case betokens ambiguity: five courts have now interpreted the certificate with varying results. Supreme Court and the Rhode Island Superior Court concluded that the certificate does not contain a cap and therefore the limit is cost-exclusive (see *Factory Mut. Ins. Co. v Excess Ins. Co.*, Super Ct, Providence, RI, May 22, 2001, Hurst, J., PC 00-0760 [litigation enjoined 285 AD2d 351 (1st Dept 2001)]; *Excess Ins. Co. v Factory Mut. Ins. Co.*, Sup Ct, NY County, Aug. 22, 2002, Moskowitz, J., Index No. 605759/99). The majority now joins the Appellate Division and the United States District Court for the Southern District, which found that the limit is cost-inclusive (see 2 AD3d 150 [1st Dept 2003]; *Allendale Mut. Ins. Co. v Excess Ins. Co. Ltd.*, 970 F Supp 265 [SD NY 1997], *rearg granted and original decision adhered to* 992 F Supp 271 [1997], *vacated* 172 F3d 37 [table, text at 1999 WL 55313, 1999 US App LEXIS 1735 (2d Cir 1999)]).

[2d Cir 1993] [following *Bellefonte* as certificate included same "subject to" language]).

The *Bellefonte* court also considered and rejected a second argument made by Aetna, which the Appellate Division applied below (2 AD3d 150 [1st Dept 2003]) and the majority now adopts. Aetna argued that the "follow the fortunes" doctrine, as embodied in a clause in the certificate,[5] obligated the reinsurers to pay all Aetna's settlements even if they were in excess of the liability limit in the reinsurance policy. The *Bellefonte* court rebuffed this argument, noting that "[t]he 'follow the fortunes' clauses in the certificates are structured so that they coexist with, rather than supplant, the *liability cap*. To construe the certificates otherwise would effectively eliminate the limitation on the reinsurers' liability to the stated amounts" (903 F2d at 913 [emphasis added]). Critically, this prong of the court's analysis was based on its conclusion that the certificate created a cap on liability through the "subject to" and the "limitation" clauses, and that "the 'follow the fortunes' doctrine does not allow Aetna to recover defense costs beyond the express cap stated in the certificates" (*id.*).

The Appellate Division disregarded the "subject to" analysis in *Bellefonte*, as does the majority, summarily concluding that "all contracts are subject to their terms and conditions" (2 AD3d at 152). Instead, the Appellate Division relied on *Bellefonte*'s "follow the fortunes" analysis, and concluded that the "overriding determination in *Bellefonte* and *Unigard* was that the 'follow the fortunes' clauses of the reinsurance contracts considered there coexisted with, and did not supplant, the contract limitations" (*id.*). In my view, this was error.

*Bellefonte*'s holding was not intended as a general rule applicable to any and all reinsurance certificates (*see* Goldstein, *Bellefonte Lives*, 8-10 Mealey's Litig Rep Reinsurance 9 [1997] [noting that *Bellefonte* should have been limited to "the specific contract language" in the certificate]). The holding relies on specific certificate language—"the first two provisions of the re-

---

5. The clause provided that "the liability of the Reinsurer . . . shall follow that of [Aetna]" (903 F2d at 911). These clauses are generally construed to mean that "the reinsurer follows the insurer's fortunes under the latter's insurance policies, subject to the stated exclusions and limitations in the reinsurance agreement . . . Without such a concept—and on occasion even with it—the reinsurer could successfully assert a defense to a claim under the reinsurance agreement, that was not asserted by the insurer with respect to the insurance claim, leaving the insurer with an unidentified liability" (Staring, Reinsurance § 18:1).

insurance certificates'' (903 F2d at 913)—which the court determined contained a "cap" on the reinsurers' liability. Because the certificate had a cap, the "follow the fortunes" clause in the certificate could not supplant the cap, which therefore limited expenses.[6]

The Appellate Division and now the majority have converted a rule unique to the specific certificate language in *Bellefonte* into a general principle that a "follow the fortunes" clause never supplants a policy limit. Thus, the majority, like the Appellate Division before it, expands *Bellefonte* from a contract-specific holding into a rule of general applicability.

When the holding of *Bellefonte*—that the reinsurance certificate's specific policy language controls whether costs are included or excluded from the limit—is applied here, it is easily distinguished. There is no "subject to" language in the reinsurance certificate at issue on this appeal. Rather, the certificate contains two discrete provisions—"LIMIT" and "CONDITIONS"—and neither offers any guidance as to whether the "CONDITIONS" are subject to the "LIMIT."

Further, it is worth observing that practitioners in the reinsurance industry have consistently criticized *Bellefonte*. Specifically, commentators have noted that in ruling "based solely on a textual interpretation of the language of the certificates," the *Bellefonte* court ignored important extrinsic evidence of industry custom and practice showing that the nature of the underlying policy often controlled whether the reinsurance limit was cost-inclusive or cost-exclusive (*see* Goldstein, *Bellefonte Lives* ["(n)otwithstanding *Bellefonte* . . . the industry for the most part has continued to follow the custom and practice of reinsurers providing coverage for expenses in addition to limits where the reinsured policy also covers expenses in addition to limits"]). There was a fear "that the *Bellefonte* rule would be applied to the same certificate language but where the reinsured policy covered defense costs in addition to limits" (*id.*).

---

**6.** Our decision in *Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London* (96 NY2d 583 [2001]) is not to the contrary. There, we were asked whether a "follow the fortunes" clause negated an insurer's obligation to apply the allocation methodology contained in the reinsurance policy. In rejecting this argument, we agreed with the "rationale" of the Second Circuit that the follow the fortunes doctrine "does not alter the terms or override the language of reinsurance policies" (*id.* at 596). Thus, *Travelers* supports the proposition that each reinsurance policy must be interpreted according to its own terms.

When *Unigard* was decided, this fear was realized. There, the certificate language was nearly identical to that in *Bellefonte*. The Second Circuit rejected extrinsic evidence that the reinsurers covered expenses in addition to the policy limit, instead choosing to rely on its holding in *Bellefonte* and the similar certificate language (4 F3d at 1071).

Commentators have similarly faulted *Allendale Mut. Ins. Co. v Excess Ins. Co. Ltd.* (970 F Supp 265 [SD NY 1997], *rearg granted and original decision adhered to* 992 F Supp 271 [1997], *vacated* 172 F3d 37 [table, text at 1999 WL 55313, 1999 US App LEXIS 1735 (2d Cir 1999)]). The federal District Court in *Allendale* was the first court to rule on the case now before us, holding that the plain language of the certificate meant that expenses were included in the policy limit.[7] Citing *Bellefonte* and *Unigard*, the court rejected Factory Mutual's request to distinguish these cases on the basis of the specific certificate language or the nature of the underlying policies (992 F Supp at 274-275). *Allendale* was thus judged to be "a significant extension" of *Bellefonte* on both fronts (*see* Goldstein, *Bellefonte Lives*; *see also* Goldstein, *For Whom Does Bellefonte Toll? It Tolls for Thee*, 9-7 Mealey's Litig Rep Reinsurance 12 [1998] ["Because *Allendale* involved reinsurance of a property policy, rather than a liability policy that provided a defense for the insured, and because the contract at issue lacked certain critical language contained in the *Bellefonte* and *Unigard* certificates, *Allendale* clearly expanded the breadth of the *Bellefonte* Rule"]).[8]

---

**7.** On reargument, however, the *Allendale* court acknowledged that "[i]n a purely semantic sense, the Reinsurance Agreement is ambiguous" (992 F Supp at 276). Nonetheless, the judge concluded that the certificate was only reasonably interpreted to be cost-inclusive. The *Allendale* court (like the majority) seemed concerned that a reinsurer would otherwise accept open-ended liability for costs (992 F Supp at 276 n 4), and thus appears to have "alter[ed] the contract to reflect its personal notions of fairness and equity" (*Greenfield v Philles Records*, 98 NY2d 562, 570 [2002]).

**8.** Other courts have regarded *Bellefonte* and *Unigard* skeptically. *Aetna Cas. & Sur. Co. v Philadelphia Reins. Corp.* (1995 WL 217631, 1995 US Dist LEXIS 4806 [ED Pa, Apr. 13, 1995]) followed *Bellefonte*, but only because Aetna was a party in *Bellefonte* and therefore was collaterally estopped from relitigating the issue. The court in *Philadelphia Reinsurance* preferred the analysis used in *Penn Re, Inc. v Aetna Cas. & Sur. Co.* (1987 WL 909519, 1987 US Dist LEXIS 15252 [ED NC, June 30, 1987]). There, the court (deciding the issue prior to *Bellefonte*) interpreted a reinsurance policy containing a "subject to" provision and found that the reinsurer was liable for costs in addition to the limit of the policy. *Bellefonte* rejected the analysis of *Penn Re*. In *North Riv. Ins. Co. v CIGNA Reins. Co.* (52 F3d 1194 [3d Cir 1995]), the court was

Today, the majority adopts the *Allendale* rationale, and suggests that Factory Mutual should have negotiated language "expressly stating that the defense costs were excluded from the indemnification limit," or otherwise setting forth "an additional limit for loss adjustment expenses that would have been separate and apart from the reinsurers' liability on the insured property" (majority op at 584-585). But Factory Mutual first obtained the relevant certificate in London in December 1990, about eight months after the Second Circuit decided *Bellefonte*. It seems harsh and unrealistic for us to fault Factory Mutual for not having drafted this certificate to conform with a recently decided case whose potential future reach could hardly have been predicted at the time.

## II.

Here, both parties moved for summary judgment, arguing that the certificate was unambiguous. Although neither party argued that the certificate was ambiguous, ambiguity is an issue of law for the courts (*Greenfield*, 98 NY2d at 569). Factory Mutual opposed the reinsurers' motion for summary judgment with extrinsic evidence of industry custom and practice, and thereby created a question of fact concerning the parties' intent (*Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.*, 32 NY2d 285, 290-293 [1973]). Our precedent establishes that where there is ambiguity in a reinsurance certificate, the surrounding

---

faced with a *Bellefonte* question, which it avoided by holding that whether the certificate placed a cap on the policy was not timely raised. In *TIG Premier Ins. Co. v Hartford Acc. & Indem. Co.* (35 F Supp 2d 348, 350 [SD NY 1999]), the court sidestepped *Bellefonte* by applying California law, which allows use of extrinsic evidence to reveal a "latent ambiguity" in a contract that "appears unambiguous on its face." Accordingly, the court reviewed extrinsic evidence showing that reinsurers commonly pay expenses in addition to limits. Finding a genuine issue of fact, the court denied the motion for summary judgment. In addition, arbitrators have apparently declined to follow *Bellefonte*, at least in some cases (*see* Monin and Brady, *Reinsurance Disputes: Death of the Handshake*, 61 Def Couns J 529, 538 n 22 [Oct. 1994]; Monin and Brady, *Updating Reinsurance Law Developments: The Gloves are Beginning to Come Off*, 63 Def Couns J 219, 223 [Apr. 1996]; *see also* Wilker and Lenci, *Much Ado About Nothing: A Response Regarding Bellefonte's Reach*, 9-10 Mealey's Litig Rep Reinsurance 16 [1998] [stating that "arbitration panels, even those sitting in the Second Circuit, are free to ignore *Bellefonte*, *Unigard*, and *Allendale*" and suggesting that "most properly constituted arbitration panels will not follow those decisions or any generalized *Bellefonte* rule unless it is shown that it was clearly the cedent's and reinsurer's intention not to cover expenses in addition to the liability limit of the certificate in question"]).

circumstances, including industry custom and practice, should be taken into consideration (*see London Assur. Corp. v Thompson*, 170 NY 94 [1902];[9] *see also Christiania Gen. Ins. Corp. of N.Y. v Great Am. Ins. Co.*, 979 F2d 268, 274 [2d Cir 1992] [citing *London Assur.*]; 1 Couch on Insurance 3d § 9:15, at 9-53).

Accordingly, I would modify the order of the Appellate Division by denying both motions, and remand the matter for further proceedings consistent with this opinion.

Chief Judge KAYE and Judges CIPARICK, ROSENBLATT, GRAFFEO and R.S. SMITH concur with Judge G.B. SMITH; Judge READ dissents and votes to modify by denying both motions for summary judgment in a separate opinion.

Order affirmed, etc.

---

**9.** "Reinsurance, like any other contract, depends upon the intention of the parties, to be gathered from the words used, taking into account, when the meaning is doubtful, the surrounding circumstances. Custom or usage is presumed to enter into the intention when it is found as a fact, not only that it existed, but was uniform, reasonable and well settled, and either known to the parties when the contract was made, or so generally known as to raise a presumption that they had it in mind at the time" (170 NY at 99).