OPINION OF THE COURT
Manzanet-Daniels, J.
Defendant the Salvation Army entered into a lease agreement with plaintiff landlords JFK Holding Company LLC and J.F.K. *275 Acquisition Group (collectively, JFK) for use of the Carlton House Hotel, located at 138-10 North Conduit Avenue, Queens, New York, as a tier II homeless facility pursuant to a parallel services agreement with the Department of Homeless Services (DHS) and the City of New York. The lease and the services agreement were negotiated together, and the Salvation Army’s obligations under the lease were funded by and through the services agreement.
During its tenancy, the Salvation Army failed to take the most basic steps to maintain the facility in a safe and sanitary condition, as a result of which the property deteriorated precipitously. The City Comptroller’s Office determined that maintenance of the property was so totally ignored that the property suffered extensive water infiltration and damage, peeling paint, contaminated carpeting, leaking fixtures, damaged appliances and infestations of roaches, mice, bedbugs and other vermin. When it vacated the property, in September 2005, the Salvation Army left an uninhabitable building, rife with code violations, structural problems, water damage and mold.
The lease provided that it was being entered into “solely in order to enable Tenant to fulfill its obligations to [DHS] under the Services Agreement.” The lease could be terminated in the event the City terminated the services agreement, provided that the Salvation Army gave 30 days’ written notice, paid JFK a $10 million early termination fee, and restored the Carlton House to “the same condition in which the leased premises was at the commencement of th[e] lease.” In addition, paragraph 12 of the lease required the Salvation Army to maintain the premises in “good and safe condition and repair, and fit to be used for their intended use . . . except for ordinary wear and tear,” and to “take every other action, at Tenant’s sole cost and expense, reasonably necessary or appropriate for the preservation and safety of the leased premises.”
Paragraph 31 further provided that in the event DHS failed to pay amounts owing pursuant to the services agreement, the Salvation Army would “use commercially reasonable efforts to enforce its rights against [DHS] under the Services Agreement or otherwise, and Landlord agrees to fully reimburse Tenant for all of its costs in any such enforcement action.” The same provision limited the Salvation Army’s liability to amounts paid pursuant to the services agreement.
On September 9, 2005, JFK notified the Salvation Army that the express conditions precedent to effective termination of the *276 lease had yet to be satisfied, including payment of the termination fee and repairs and restoration necessary to return the Carlton House to its pre-lease condition. Yet, the Salvation Army did nothing to ensure that DHS or the City paid for the restoration of the property, as the City was obligated to do per the terms of the services agreement, prior to its expiration.* Indeed, the Salvation Army took no action to obtain the funding necessary from DHS or the City or otherwise to enforce or preserve its rights under the services agreement. As a result, DHS and the City are no longer obligated to repay the Salvation Army for expenses relating to the property’s restoration, since the services agreement provides that any claim against the City or DHS must be interposed within six months after termination of the services agreement or accrual of the cause of action.
The Carlton House is presently uninhabitable. Plaintiffs allege that it will cost approximately $200 million to restore the property to a usable and marketable condition.
Plaintiffs, in our view, have sufficiently pleaded a cause of action for breach of the lease. The Salvation Army does not dispute that it failed to return the property to its pre-lease condition upon termination, contrary to paragraph 23 of the lease. Further, paragraph 31 of the lease requires the Salvation Army to “use commercially reasonable efforts” to ensure that funds necessary to meet its obligations are provided by DHS and the City pursuant to the services agreement. The parties’ intent, as reflected in the lease, was to impose on the Salvation Army the obligation to take all commercially reasonable steps, including seeking funds to which it was entitled under the services agreement (as incorporated by reference therein), to satisfy its obligation to restore the property to pre-lease condition. To read the lease in any other way would render meaningless paragraph 31’s requirement that the Salvation Army “use commercially reasonable efforts” to ensure payment, contrary to established precepts of construction. It is a cardinal rule of contract construction that a “court should construe [an] agreement ] so as to give full meaning and effect to the material provisions” (Excess Ins. Co. Ltd. v Factory Mut. Ins. Co., 3 NY3d 577, 582 [2004]), and that “[a] reading of the contract should not render any portion meaningless.” “[A] contract should be read as a whole, and every part will be interpreted with refer *277 ence to the whole; and if possible it will be so interpreted as to give effect to its general purpose.” (Beal Sav. Bank v Sommer, 8 NY3d 318, 324-325 [2007] [internal quotation marks omitted].) Indeed, the clause requiring the Salvation Army to make commercially reasonable efforts to ensure that JFK received the benefit of its bargain was included for the evident purpose of ensuring that the Salvation Army would enforce its rights under the services agreement so as to meet its obligations to JFK under the lease.
The dissent, citing the provision of the lease which limited damages to amounts paid by DHS and the City pursuant to the services agreement, reasons that since no amounts had been so paid, the Salvation Army has no liability. Yet no amounts had been paid under the services agreement precisely because the Salvation Army failed to “use commercially reasonable efforts” as it was obligated to do under the terms of the parties’ lease. The contractual limitation on liability was obviously predicated upon the Salvation Army’s having fulfilled its contractual duty to use commercially reasonable efforts to secure payments from DHS pursuant to the services agreement. Indeed, the limitation of liability cited by the dissent appears in the very same paragraph of the contract. To “decouple” the limitation of liability from the provision requiring that the Salvation Army use commercially reasonable efforts would render the latter an illusory promise. The two clauses are intended to be read together; only if the Salvation Army used commercially reasonable efforts to obtain payment pursuant to the services agreement would it be able to take advantage of the provision limiting its liability to such payments (see MBIA Ins. Corp. v Patriarch Partners VIII, LLC, 842 F Supp 2d 682, 708-709 [SD NY 2012] [provision in agreement absolving party of liability under certain circumstances for failure to satisfy conditions with respect to class B note obligations did not bar action where, inter alia, a factual issue existed as to whether that party used commercially reasonable efforts, as stipulated by the contract, to seek a rating on the class B notes]). It is elementary that such exculpatory provisions are to be strictly construed against the party seeking exemption from liability, here, the Salvation Army. The dissent’s proposed reading of the contract not only eviscerates the provision requiring the Salvation Army to use “commercially reasonable efforts,” but grants the Salvation Army the benefit of the concurrent limitation on liability, frustrating the manifest purpose of the contract and essentially rewarding the Salvation Army for its bad behavior.
*278 On this record, triable questions of fact exist as to whether the Salvation Army used commercially reasonable efforts to obtain the payments to which it was entitled under the services agreement. Until such questions are determined, the Salvation Army cannot avail itself of a contractual limitation of liability intended for its benefit.
The dissent’s reading of the lease is contrary to its plain language and improperly renders meaningless the provision requiring the Salvation Army to act in a commercially reasonable manner to ensure the City made payments owing pursuant to the services agreement. Further, the dissent’s interpretation — absolving the Salvation Army from liability where it failed to take any steps, let alone commercially reasonable ones, to ensure it received monies from the City pursuant to the services agreement — allows the Salvation Army to breach its obligations under the lease with impunity.
Since the breach of the implied covenant of good faith and fair dealing cause of action is premised on the same allegations, i.e., that the Salvation Army failed to take commercially reasonable steps to ensure payment by the City pursuant to the services agreement, it is duplicative and thus was properly dismissed on that basis (see Amcan Holdings, Inc. v Canadian Imperial Bank of Commerce, 70 AD3d 423, 426 [2010], lv denied 15 NY3d 704 [2010]).
Accordingly, the judgment of the Supreme Court, New York County (Cynthia S. Kern, J.), entered November 5, 2010, insofar as appealed from as limited by the briefs, dismissing the complaint as against the Salvation Army, should be reversed, on the law, without costs, the judgment vacated, the third cause of action for breach of contract reinstated, and the matter remanded for further proceedings.

 The City, on September 28, 2005, paid the $10 million early termination fee to JFK as required by the lease and that amount is accordingly no longer at issue.