[865 NE2d 1210, 834 NYS2d 44]

Beal Savings Bank, Appellant, v Viola Sommer et al., as Trustees of a Trust under the Will of Sigmund Sommer, Deceased, Respondents.

Argued February 7, 2007; decided March 22, 2007

## POINTS OF COUNSEL

*Hawkins, Parnell & Thackston, LLP* (*Robert B. Gilbreath,* of the Texas bar, admitted pro hac vice, of counsel), *Schulte Roth & Zabel LLP,* New York City (*Michael L. Cook* and *Curtis J. Weidler* of counsel), and *Jenkens & Gilchrist,* Dallas, Texas (*Theodore W. Daniel* of counsel), for appellant. I. The Sommer Trust's theories cannot survive under the standard of review or basic contract construction principles. (*AG Capital Funding Partners, L.P. v State St. Bank & Trust Co.,* 5 NY3d 582; *R/S Assoc. v New York Job Dev. Auth.,* 98 NY2d 29; *Matter of Salvano v Merrill Lynch, Pierce, Fenner & Smith,* 85 NY2d 173; *Levenberg v Skouras,* 248 App Div 629; *Goodison v Goodison,* 66 AD2d 923; *Gaultney-Klineman Art v Hughes,* 227 AD2d 221.) II. Because the Credit Agreement was a syndicated loan, Beal Savings Bank had the right to individually enforce the Keep-Well Agreement. III. The Credit Agreement does not override the Keep-Well Agreement's "enforceable . . . by each Lender" clause. (*Levenberg v Skouras,* 248 App Div 629; *Security-First Natl. Bank of Los Angeles v Lloyd-Smith,* 259 App Div 220; *Salomon v Angsten,* 19 AD3d 143; *Matter of Lahm,* 179 App Div 757; *Congress Factors Corp. v Meinhard Commercial Corp.,* 129 Misc 2d 726; *Riback v Prudence Co.,* 152 Misc 331; *General Inv. Co. v Interborough R.T. Co.,* 200 App Div 794; *Arnoff v Metropolitan Cas. Ins. Co. of N.Y.,* 160· Misc 209; *Townsend v Colorado Fuel & Iron Co.,* 16 App Div 314; *Shire Realty Corp. v Schorr,* 55 AD2d 356.) IV. Other provisions in the Loan Documents give Beal Savings Bank the absolute right to enforce the Keep-Well Agreement. (*New Bank of New England, N.A. v Toronto-Dominion Bank,* 768 F Supp 1017; *In re Owens Corning,* 419 F3d 195; *Chase Manhattan Bank v Motorola, Inc.,* 136 F Supp 2d 265.)

*Skadden, Arps, Slate, Meagher & Flom LLP,* New York City (*Scott D. Musoff, Preeta D. Bansal* and *Jay B. Kasner* of counsel), for respondents. I. The Loan Documents specifically and unambiguously preclude Beal Savings Bank from suing individually to recover a judgment under the Keep-Well Agreement. (*Matter of Westmoreland Coal Co. v Entech, Inc.,* 100 NY2d 352; *New Bank of New England, N.A. v Toronto-Dominion Bank,* 768 F Supp 1017; *Carondelet Sav. & Loan Assn. v Citizens Sav. & Loan Assn.,* 604 F2d 464; *South Rd. Assoc., LLC v International Bus. Machs. Corp.,* 4 NY3d 272; *Muzak Corp. v Hotel Taft Corp.,*

1 NY2d 42; *God's Battalion of Prayer Pentecostal Church, Inc. v Miele Assoc., LLP,* 6 NY3d 371; *Hooper Assoc. v AGS Computers,* 74 NY2d 487; *Two Guys from Harrison-N.Y. v S.F.R. Realty Assoc.,* 63 NY2d 396; *Corhill Corp. v S.D. Plants, Inc.,* 9 NY2d 595; *First Natl. Bank of Louisville v Continental Ill. Natl. Bank & Trust Co. of Chicago,* 933 F2d 466.) II. Beal Savings Bank's citation to irrelevant provisions in the Loan Documents does not affect interpretation of the unambiguous language in the Credit Agreement. (*South Rd. Assoc., LLC v International Bus. Machs. Corp.,* 4 NY3d 272; *Matter of Westmoreland Coal Co. v Entech, Inc.,* 100 NY2d 352; *First Natl. Bank of Louisville v Continental Ill. Natl. Bank & Trust Co. of Chicago,* 933 F2d 466; *Mark Twain Bank v Continental Bank, N.A.,* 817 F Supp 792; *Credit Francais Intl. v Sociedad Fin. de Comercio,* 128 Misc 2d 564; *A.I. Credit Corp. v Government of Jamaica,* 666 F Supp 629; *New Bank of New England, N.A. v Toronto-Dominion Bank,* 768 F Supp 1017; *Chase Manhattan Bank v Motorola, Inc.,* 136 F Supp 2d 265.) III. Beal Savings Bank's interpretation undermines the collective lender action scheme set forth in the Loan Documents. (*Credit Francais Intl. v Sociedad Fin. de Comercio,* 128 Misc 2d 564; *New Bank of New England, N.A. v Toronto-Dominion Bank,* 768 F Supp 1017; *Goldsmith v Metromedia Fiber Network,* 293 AD2d 383; *A.I. Credit Corp. v Government of Jamaica,* 666 F Supp 629; *In re Kristal,* 758 F2d 454; *Commercial Bank of Kuwait v Rafidain Bank,* 15 F3d 238; *General Inv. Co. v Interborough R.T. Co.,* 200 App Div 794, 235 NY 133; *Riback v Prudence Co., Inc.,* 152 Misc 331; *Arnoff v Metropolitan Cas. Ins. Co. of N.Y.,* 160 Misc 209; *Townsend v Colorado Fuel & Iron Co.,* 16 App Div 314.) IV. Even were Beal Savings Bank permitted to bring suit unilaterally under the Keep-Well Agreement, the Sommer Trust's liability would be limited to 4.5% of whatever amount is allegedly owed. (*Nichols v Hartford Fire Ins. Co.,* 61 AD2d 555; *Zivian v McNulty,* 136 AD2d 547; *Amaducci v Metropolitan Opera Assn.,* 33 AD2d 542; *A.I. Credit Corp. v Government of Jamaica,* 666 F Supp 629; *Noise In The Attic Prods., Inc. v London Records,* 10 AD3d 303; *Alpha Auto Brokers v Continental Ins. Co.,* 286 AD2d 309.)

## OPINION OF THE COURT

Chief Judge KAYE.

We are asked to determine whether one lender in a syndicated loan arrangement has standing to sue for breach of contract, contrary to the will of the other 36 lenders to forbear from tak-

ing action. The specific, unambiguous language of several provisions, read in the context of the agreements as a whole, convinces us that, in this instance, the lenders intended to act collectively in the event of the borrower's default and to preclude an individual lender from disrupting the scheme of the agreements at issue.

## Facts

On February 26, 1998, a lending syndicate, originally comprised of 13 institutions (the Lenders), invested in the construction of Aladdin Gaming, LLC (the Borrower), to develop the Aladdin Resort and Casino in Las Vegas, Nevada. The Lenders advanced 410 million dollars through the Bank of Nova Scotia (succeeded by BNY Asset Solutions, LLC), the Administrative Agent. A Credit Agreement was the primary loan document governing the loan. A Keep-Well Agreement, which plaintiff-appellant Beal Savings Bank alleges was breached, was one of the many ancillary instruments evidencing the loan.[1] Both the Credit Agreement and the Keep-Well were dated February 26, 1998.

### The Credit Agreement

The title page of the Credit Agreement shows Aladdin Gaming, LLC, as the Borrower, "Various Financial Institutions" as the Lenders, the Bank of Nova Scotia as the Administrative Agent and two other institutions, the syndication agent and the documentation agent. The Lenders are not individually named.

Under section 9.1 of the Credit Agreement, the Lenders authorize the Administrative Agent to act on their behalf pursuant to the Loan Documents and, "in the absence of other written instructions from the Required Lenders . . . to exercise such powers . . . as are specifically delegated to or required of the Administrative Agent by the terms [of the Loan Documents],

---

1. Loan Documents, as defined in Credit Agreement § 1.1, include the Credit Agreement, the Keep-Well, Notes, Letters of Credit, Pledge Agreements, a Completion Guaranty and a Deed of Trust, among others. A Keep-Well Agreement is a contract by a parent company promising financial assistance and management support for its subsidiary. This agreement confirms the parent company's obligation to maintain the subsidiary's favorable finances (see Securities and Exchange Commission, *Disclosure in Management's Discussion and Analysis about Off-Balance Sheet Arrangements and Aggregate Contractual Obligations*, RIN 3235-AI70 n 77 [Jan. 28, 2003]; Don Wiesner, *Keep-well letters: the elusive contingency*, The CPA Journal Online <http://www.nysscpa.org/cpajournal/old/07950746.htm> [Nov. 1989] [accessed Feb. 23, 2007]).

together with such powers as may be reasonably incidental thereto." The term "Required Lenders" is defined as those holding at least $66\frac{2}{3}\%$ of the outstanding principal and the participation interests in the outstanding Letters of Credit (Credit Agreement § 1.1). Among those powers delegated to the Administrative Agent are that it set the Base Rate of interest and the London Interbank Offer (LIBO) Rate (Credit Agreement §§ 1.1, 3.2), collect payments from the Borrower for the pro rata account of the Lenders (§ 4.7), and review financial statements of the Borrower and other Aladdin Parties (§§ 5.1.4, 6.5).

Article 8 of the Credit Agreement addresses Events of Default. Section 8.1.4 provides that the Borrower defaults if, after the Administrative Agent gives notice, the nonperformance continues for 30 days. Section 8.3 states that the Administrative Agent, at the direction of the Required Lenders, may "exercise any or all rights and remedies at law or in equity," including the right to recover judgment on the Keep-Well. The Credit Agreement includes a section providing that if a Lender receives any payment, such as by setoff, it must share any excess of its pro rata share of payments with the other Lenders (§ 4.8). Section 10.20 is a cumulative remedies provision that "[n]o right or remedy conferred upon the Administrative Agent or the Lenders in this Agreement is intended to be exclusive" and "every such right and remedy shall be cumulative . . . to every other right or remedy contained in the other Loan Documents . . . ."

The Keep-Well Agreement

The Keep-Well Agreement was made, as the title pages state, "in favor of each of the Administrative Agent and the Lenders and their respective successors, transferees and assigns." The Sponsors agreed in section 2 of the Keep-Well to make Equity Contributions to the Borrower if the financial ratio fell below a certain minimum. Section 4 states that in the event of acceleration under section 8.2 and section 8.3 of the Credit Agreement the Sponsors guarantee payment of the accelerated amount to the Administrative Agent for the benefit of the Lenders.

The Keep-Well is not a stand-alone document but is to be read in accordance with the Credit Agreement. Section 18, "Miscellaneous Provisions," provides in subsection (a) that the Keep-Well is a "Loan Document executed pursuant to the Credit Agreement and shall (unless otherwise expressly indicated

herein) be construed, administered and applied in accordance with the terms and provisions thereof." The next subsection, 18 (b), states that the Keep-Well is binding upon the Sponsors and their successors and shall "be enforceable by the Administrative Agent and each Lender" and their assigns. Section 18 (e), like section 10.20 of the Credit Agreement, is a cumulative remedies provision.

## Enter the Plaintiff

In July 2000, the Borrower obtained a 50 million dollar increase in loan funds, and the Sommer Trust, one of the Borrower's parent companies, agreed to become a Sponsor along with other organizations under the Keep-Well Agreement. The Aladdin casino began operations, but just after September 11, 2001, the Borrower sought bankruptcy protection. Neither plaintiff-appellant Beal nor its assignor, BFC Capital, Inc., was an original Lender, and neither held any interest in the loan when the Borrower petitioned for bankruptcy protection. BFC acquired a 4.5% interest in the bank debt after the Borrower filed for bankruptcy.

On September 30, 2002, the Administrative Agent and all of the Lenders—holding 95.5% of the outstanding principal amount—except BFC entered into a Settlement Agreement with the Sommer Trust and two other sponsors. The Settlement Agreement directed the Administrative Agent to forbear from enforcing any obligations that the Trust had under the Keep-Well. In addition, the Lenders would turn over to the Trust any amounts they collected from BFC under a sharing clause in the Credit Agreement. As consideration, the Trust transferred "to the Administrative Agent for the benefit of the Prepetition Lenders and BFC" (Settlement Agreement § 1) the Trust's interest in a shopping mall and the benefit of the Trust's facilitating the sale of the Borrower's property. BFC, Beal's predecessor, received its pro rata share from this consideration. The Settlement Agreement also provided for the distribution of 6.5 million dollars to the Prepetition Lenders, not including BFC.

At the time of the execution of the Settlement, 37 Lenders were members of the syndicate. Thirty-six Lenders (all but BFC, Beal's assignor) agreed that the terms of the settlement were of greater benefit to the consortium than an attempt to recover under the Keep-Well.

The Litigation

On April 6, 2005, Beal filed a claim under section 4 of the Keep-Well and sought 90 million dollars to share with the other Lenders or, in the alternative, Beal's pro rata share.[2] The Trust, moving to dismiss, contended that Beal lacked standing, for no individual member of the consortium was empowered to enforce the agreements in the event of default, and only the Administrative Agent, at the behest of a supermajority of Lenders, could do so. Beal argued that while the agreements authorized the Agent to act administratively, no provision in the agreements precluded a Lender from otherwise proceeding individually. The Supreme Court granted the Trust's motion under CPLR 3211 (a) (1) and (7) to dismiss the complaint on the grounds that the Loan Documents explicitly and implicitly precluded Beal from recovering a judgment under the Keep-Well. Affirming, the Appellate Division concluded that the Keep-Well is to be administered in accordance with the terms of the Credit Agreement, which sets forth the procedures in the event of default, and that those procedures provide for collective action. We agree with the trial court and Appellate Division, and now affirm.

## Analysis

The governing principles are familiar. On a motion to dismiss pursuant to CPLR 3211, the court may grant dismissal when " 'documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law' " (*Goldman v Metropolitan Life Ins. Co.*, 5 NY3d 561, 571 [2005], quoting *Held v Kaufman*, 91 NY2d 425, 430-431 [1998]). Construction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms (*see Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004]; *W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990]). The court should "construe the agreements so as to give full meaning and effect to the material provisions" (*Excess Ins. Co. Ltd. v Factory Mut. Ins. Co.*, 3 NY3d 577, 582 [2004]). A reading of the contract should not render any portion meaningless (*see God's Battalion of Prayer Pentecostal Church, Inc. v Miele Assoc., LLP*, 6 NY3d 371, 374 [2006]; *Excess Ins. Co.*, 3 NY3d at 582). Further, a contract should be "read as a whole, and every part will be interpreted with reference to the whole;

2. Both the Credit Agreement (§ 10.14) and the Keep-Well (§ 18 [h]) provide that they will be "governed by and construed in accordance with the internal laws of the State of New York."

and if possible it will be so interpreted as to give effect to its general purpose" (*Matter of Westmoreland Coal Co. v Entech, Inc.*, 100 NY2d 352, 358 [2003] [citations omitted]).

In *Credit Francais Intl. v Sociedad Fin. de Comercio* (128 Misc 2d 564 [Sup Ct, NY County 1985]), the court analyzed a situation similar to the one presented here. A syndicate of banks lent money to a Venezuelan financial institution. When the government of Venezuela called on financial institutions to suspend payments of principal, the borrower sought to delay its payments. The majority of the banks in the consortium chose to allow delayed payment, and only one member sought to proceed against the borrower. The court noted that the loan transaction was between the borrower and a consortium, not individual banks. Even the title page—that the lenders were not named but were called "Depositors"—indicated that the nature of the agreement was that the lenders act collectively. The agent was authorized to act on behalf of the lenders collectively by its own initiative or at the direction of a majority of lenders: the agent determined the rate of interest, collected repayments for the pro rata account of each depositor, collected advances to be made to the borrower and received the borrower's financial statements to provide to the lenders. Concerning the provision on acceleration, the court wrote:

> "The actual acceleration of the entire amount due does not occur, however, until the agent, 'with the consent or at the direction of the Majority Depositors', declares the entire amount due and payable . . . . Thus, while the agent has the power to declare the entire amount due if an event of acceleration occurs, he also has the power to refrain from accelerating the entire amount unless otherwise directed by the majority depositors. No individual bank is given those rights" (*id.* at 578).

The court also noted that a sharing provision was included to prevent a bank from obtaining an undue preference so that were an individual institution to obtain any payment, that bank would act as agent on behalf of all the depositors. The parties thus contemplated that the agent take collective action on behalf of all members pursuant to the direction of the majority depositors. Such a plan was intended to prevent the possibility of a multiplicity of suits by individual banks perhaps working at cross-purposes—a situation that could be chaotic.

A cumulative remedy clause, the court said, was "merely" to "assure[ ] the parties that the election of one remedy does not

preclude another" (*id.* at 579). Nothing in that section justified departure from the overall scheme to have the agent act for the consortium. Finally, the court found that other sections including the terms "any Depositor" or "Depositors" were not blanket authorizations for individual action. An agreement that intends to have individual depositors proceed independently should so provide explicitly.

Similarly, in *New Bank of New England, N.A. v Toronto-Dominion Bank* (768 F Supp 1017 [SD NY 1991]), the majority of lenders in a syndicate wished to negotiate with the defaulting borrower, and one lender refused to consent to a waiver of default. An Intercreditor Agreement provided that "the agent *may* act in certain circumstances in accordance with the directions of the majority lenders" (*id.* at 1020). The court determined that the discretionary language allowed a majority to direct acceleration but also authorized it to refrain from doing so. No provision permitted a minority lender to compel acceleration. The meaning of the agreement between sophisticated parties was unambiguous, even if one party asserted a different interpretation (*id.* at 1021, 1022; *see also In re Enron Corp.*, 302 BR 463, 473 [Bankr SD NY 2003], *affd* 2005 WL 356985, 2005 US Dist LEXIS 2134 [SD NY 2005]).

Here, of course, neither the Credit Agreement nor the Keep-Well contains an explicit provision stating that a Lender may—or may not—take individual action in the event of default, and thus we are compelled to look to other specific clauses and the agreements as a whole to ascertain the parties' intent. The examination leads us to conclude that the agreements have an unequivocal collective design.

Section 18 (a) of the Keep-Well states that it was "executed pursuant to the Credit Agreement" and, unless otherwise expressly indicated, must be "construed, administered and applied" in accordance with the Credit Agreement. No express provision in the Keep-Well sets forth the actions to be taken in the event of default. Only article 8 of the Credit Agreement articulates these procedures. Section 8.3 provides:

> "If any Event of Default . . . shall occur for any reason, whether voluntary or involuntary, and be continuing, the Administrative Agent, upon the direction of the Required Lenders, shall by notice to the Borrower declare all or any portion of the outstanding principal amount of the Loans and

other Obligations . . . to be due and payable or the Commitments . . . to be terminated, whereupon . . . the Borrower shall automatically and immediately be obligated to deposit with the Administrative Agent cash collateral in an amount equal to all Letter of Credit Outstandings . . . . In addition to the foregoing, the Administrative Agent upon direction of the Required Lenders may, without further notice of default, presentment or demand for payment, protest or notice of non-payment or dishonor, or other notices or demands of any kind . . . , exercise any or all rights and remedies at law or in equity (in any combination or order that the Lenders may elect, subject to the foregoing), including, without prejudice to the Lenders' other rights and remedies, the following: . . .

"(h) recover judgment on the Completion Guaranty or the Keep-Well Agreement either before, during or after any proceedings for the enforcement of the Lenders' rights and remedies hereunder or under the other Loan Documents."

Thus, under section 8.3, the Administrative Agent acts upon the direction of the Required Lenders—a two-thirds majority—to give notice to the Borrower and, if required, the Borrower must deposit the outstanding principal with the Administrative Agent. In addition, it is the Administrative Agent that, upon direction of the Required Lenders, may exercise any or all rights and remedies as the Lenders elect, including recovering judgment on the Keep-Well Agreement "for the enforcement of the Lenders' rights and remedies."

Section 18 (b) of the Keep-Well, on which Beal relies to assert standing, is a general section that provides:

"This Agreement shall be binding upon the Sponsors and their permitted successors, transferees and assigns and shall inure to the benefit of and be enforceable by the Administrative Agent and each Lender and their respective successors, transferees and assigns; provided, however, that the Sponsors may not assign any of their obligations hereunder without the prior written consent of the Required Lenders."

The language of section 18 (b) that the Keep-Well is enforceable by the Administrative Agent and each Lender does not expressly

override the specific language of section 8.3 that in the event of default the Administrative Agent at the direction of the Required Lenders may or may not attempt to recover judgment. Moreover, section 18 (b) addresses the issue of "successors, transferees and assigns" to ensure that Lenders' assignees would not be left out of the collective enforcement mechanism, and that the Sponsors do not assign their obligation without the written consent of the Required Lenders.

An interpretation favoring Beal's view would render section 8.3 meaningless because there would be no reason to provide that the Required Lenders could enforce the agreements by a supermajority directing the Administrative Agent to act (*see Excess Ins. Co.*, 3 NY3d at 582). Nor does the language of section 8.3 support Beal's contention that, if the Administrative Agent does not move to enforce the Keep-Well, any individual Lender may do so. As the court in *Credit Francais* construed a similar provision, the Administrative Agent, at the direction of the Required Lenders, has the power to declare the entire amount due and the power to refrain from accelerating—no individual institution is given those rights (128 Misc 2d at 578). Here, the Required Lenders—with 95.5% of the interest, well over a supermajority—made an election by directing the Administrative Agent not to pursue legal action (*see New Bank of New England*, 768 F Supp at 1020). Section 18 (b) of the Keep-Well, as analyzed in the context of an event of default, does not contravene the Required Lenders' decision to act collectively (*see Westmoreland Coal*, 100 NY2d at 358).

Beal brings this suit under section 4 of the Keep-Well:

> "In the event that the Obligations of the Borrower under the Credit Agreement shall be accelerated pursuant to the provisions of Section 8.2 or 8.3 thereof, the Sponsors guarantee and agree to pay the Accelerated Payment Amount to the Administrative Agent for the benefit of the Lenders not later than forty (40) days following the date of such acceleration."

The only entity section 4 mentions as having the right to pursue default remedies is the Administrative Agent. Thus, this section actually underscores the collective enforcement scheme envisioned by the signatories of the Loan Documents.

Besides these specific provisions, other language in the agreements confirms that the Lenders contemplated unified action by the Administrative Agent. The Agent does not perform

merely mechanical or technical functions but rather has a broad grant of power. Section 9.1 of the Credit Agreement provides that "[e]ach Lender authorizes the Administrative Agent to act on behalf of such Lender" under the Loan Documents and to exercise the powers delegated to it, in the absence of written instructions from the Required Lenders. The Agent may, among other things, set rates of interest and review the Borrower's financial statements. Even the title page of the Credit Agreement names the Administrative Agent but refers to the Lenders as "Various Financial Institutions" without naming them. Although Beal argues that an Administrative Agent generally should have only ministerial powers, in these Loan Documents the parties specified that the Agent have both discretionary power and power under the direction of the Required Lenders.

Beal contends that section 4.8 of the Credit Agreement, the sharing provision, supports the agreements' enforceability by each Lender individually. The section states that if any Lender obtains payment by "setoff or otherwise" in excess of its pro rata share, that Lender must share the excess ratably with the other Lenders. Beal's interpretation is that if one bank can receive money, then that bank must be able to sue for judgment. We conclude, on the contrary, that this provision—under which each Lender who receives moneys is deemed to have received on behalf of all Lenders—underscores the collective design of the agreements that Lenders share the risks of potentially unequal treatment (*see Credit Francais*, 128 Misc 2d at 578 [sharing provision prevented one bank from obtaining an undue preference over another]; *see also Enron*, 2005 WL 356985 at *7, 2005 US Dist LEXIS 2134 at *29 [while an individual lender might exercise a right of setoff or counterclaim, there was no basis to conclude that the parties intended rights against pledged collateral]).

Nor do the cumulative remedies provisions support individual action. Section 10.20 of the Credit Agreement grants the Administrative Agent or the Lenders remedies at law and in equity "in addition to every other right or remedy" contained in all Loan Documents. Section 18 (e) of the Keep-Well Agreement states that "[n]o failure on the part of the Administrative Agent or any Lender to exercise, and no delay in exercising, any right" will be deemed a waiver, and that the remedies are cumulative, not exclusive, to remedies provided by law. The purpose of section 18 (e) is to assure that the Agent's or a Lender's failure or delay in enforcing rights is not a waiver of

those rights. Both these provisions—intended to preserve alternate remedies—do not provide to each Lender express grants of enforcement in the event of default (*see Credit Francais*, 128 Misc 2d at 579; *Enron*, 302 BR at 475).

To support its interpretation that it has standing to sue, Beal points to section 10.1 (f) of the Credit Agreement, which provides that no amendment, modification or waiver can be made to the Loan Documents so as to "release the Sponsors under the Keep-Well Agreement . . . without the consent of all Lenders." Beal contends that the Prepetition Lenders who completed the Settlement with the Trust constructively waived Beal's rights under the Keep-Well because the Lenders did not have Beal's required consent. Beal also refers to section 7 of the Keep-Well, which states that "the obligations of the Sponsors under it shall be absolute and unconditional under any and all circumstances." Section 7 specifies that the Sponsors "shall not be released from their obligations . . . because of . . . (b) [a]ny waiver . . . , modification, forbearance, delay or other act or omission of the Administrative Agent or the Lenders, or any failure to proceed promptly . . . against the Borrower [or] any Sponsor."

The Trust acknowledges that the unanimous consent clause ensures that the terms of the loan cannot be altered in a manner inconsistent with what other Lenders originally agreed to. However, here, the Settlement did not release the Trust of its obligations by amending, modifying or waiving any provision in the agreements. Nor did the Trust breach the Keep-Well Agreement. Rather, the issue concerns a default and, under the Credit Agreement, even if the Settlement has a "similar effect" to a release, the supermajority of Lenders exercised their rights by restructuring the debt of a financially troubled Borrower (*see First Natl. Bank of Louisville v Continental Ill. Natl. Bank & Trust Co. of Chicago*, 933 F2d 466 [7th Cir 1991] [agent did not breach contract when it acted collectively with other lenders not to accelerate notes despite borrower's default and over objection of individual bank]; Howard J. Kashner, *Majority Clauses and Non-Bankruptcy Corporate Reorganizations—Contractual and Statutory Alternatives*, 44 Bus Law 123, 125-126 [Nov. 1988] [better practice, when agreement has waiver and supermajority clauses, is to allow supermajority to elect action before bankruptcy to avoid preferential treatment of one institution over others]). Thus, the provisions concerning amendment, modification and waiver of the agreements do not preclude the Adminis-

trative Agent and 95.5% of the Lenders from attempting to recover on as much of the Trust's obligations as they could.

Moreover, language in other provisions referring to actions by the Administrative Agent and "any Lender" is found in general provisions, for example, stating that the Sponsors waive certain defenses and rights, and does not provide a source for individual Lenders to enforce the Keep-Well Agreement. For example, under section 9.6 of the Credit Agreement, each Lender, without reliance on the Administrative Agent or any other Lender, acknowledges making its own credit decisions. This provision "addresses the concerns of the Administrative Agent" that banks do not rely on it for assessing risks (*Enron*, 302 BR at 475). The provision does not, as advocated by Beal, authorize individual enforcement of the Keep-Well.

Beal's reliance on *Commercial Bank of Kuwait v Rafidain Bank* (15 F3d 238 [2d Cir 1994]), in which the court concluded that an individual lender did have standing to sue, is unavailing. In *Commercial Bank*, the agent's grant of authority was limited to suing "only if requested to do so by the Majority Banks," and this provision did "not abrogate the rights of participating banks to sue on their own" (*id.* at 243). Unlike the finding in *Credit Francais*, the court said that provisions regarding the pro rata distributions of proceeds recovered by individual banks supported one bank's standing to sue. This case, however, is distinguishable from *Credit Francais, New Bank* and *Enron* in that the ruling was based on English law that an undisclosed principal can sue on a contract except when "the terms of the contract expressly or impliedly confine it to the parties to it" (*Commercial Bank*, 15 F3d at 243).

In another case cited by Beal, *A.I. Credit Corp. v Government of Jamaica* (666 F Supp 629 [SD NY 1987]), the court held that individual lenders could sue to enforce the borrower's obligations. The court noted certain provisions including pro rata and waiver sections such as those described here to support the finding. However, the agreement there expressly provided:

> "The amounts payable at any time hereunder to each Bank shall be a separate and independent debt and each Bank shall be entitled to protect and enforce its rights arising out of this Agreement, and it shall not be necessary for any other Bank to be joined as an additional party in any proceedings for such purpose" (666 F Supp at 631).

In addition, the agreement specified that the agent "shall perform the mechanical and clerical functions" and have a strictly limited role (*id.*).

In this case the parties decided not to include a specific statement that each Lender individually may enforce its rights in the event of default. Had the parties intended that an individual have a right to proceed independently, the Credit Agreement or the Keep-Well should have expressly so provided.[3] In an event of default, the lenders' "rights to payment of principal and interest have, as a financial matter, already been impaired" (Kashner, *Majority Clauses and Non-Bankruptcy Corporate Reorganizations*, 44 Bus Law at 125). Here, the supermajority vote is meant to protect all Lenders in the consortium from a disaffected Lender seeking financial benefit perhaps at the expense of other debtholders. Therefore, the Required Lenders, rather than initiating separate, multiple lawsuits, chose not to jeopardize the interests of each institution. We conclude, based on the explicit language of the agreements and the provisions read as a whole, that the parties intended for collective action in the event that the obligations of the Borrower could be accelerated.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

SMITH, J. (dissenting). A bank that lends money to a borrower and is not repaid is entitled to sue to get its money back. That is, at least, the assumption that most banks surely make when they enter into loan agreements. A bank that is part of a lending group can, of course, agree that no suit will be brought unless a majority or supermajority of the lenders agree to take action, but if that agreement is made, it should be stated in plain language in the document. It is not hard to say: "No suit shall be brought except by the Administrative Agent, acting upon the written instructions of the Required Lenders." No such language, or anything that can fairly be read as its equivalent,

---

**3.** We recognize that the contrary argument also can be made: had the parties intended to *preclude* the right to proceed individually, they should have said so explicitly. And surely, for the future, parties should expressly state their intention in this regard. It goes without saying, however, that if parties behaved precisely as they should, there would be no ground for litigation; cases reach us only because question can be raised. Though question can be raised, here we are satisfied that the answer given by the trial court and Appellate Division, based on the language and purport of the agreements, is the correct one.

appears in this Credit Agreement or Keep-Well Agreement, and I dissent from the majority's decision to read it in.

This transaction was a number of separate loans, on identical terms, made by lenders including Beal's predecessor directly to the borrower. Section 2.1, the first substantive term of the Credit Agreement, says so: "each Lender *severally* agrees to make Loans . . . ." (§ 2.1 [a] [emphasis added].) The normal expectation of the parties to such a transaction is that each lender may sue separately to recover its loan, if the agreement does not say otherwise (*see Commercial Bank of Kuwait v Rafidain Bank*, 15 F3d 238, 243 [2d Cir 1994]; *New Bank of New England, N.A. v Toronto-Dominion Bank*, 768 F Supp 1017, 1023 [SD NY 1991]).

The majority holds that this Credit Agreement does say otherwise, relying on "[t]he specific, unambiguous language of several provisions" (majority op at 321), but it never identifies any "specific, unambiguous" surrender of individual lenders' rights to sue. The majority gives primary importance to section 8.3 of the Credit Agreement (*id.* at 326-327), but nothing in that section says or implies that a single lender may not bring suit. The section says that "the Administrative Agent upon direction of the Required Lenders may . . . exercise any or all rights and remedies at law or in equity," including the right to recover under the Keep-Well Agreement; but it does not say that no lender may exercise its own rights. A statement that an agent may act on a principal's behalf does not mean that the principal has disabled itself from acting on its own.

The majority is incorrect in saying that Beal's interpretation of section 8.3 would "render [it] meaningless" (majority op at 328). Section 8.3 means what it says—that certain powers may be exercised by the Administrative Agent at the direction of a supermajority, not that those powers are surrendered by the lenders. Indeed, the majority's reading of section 8.3 to say that only the Administrative Agent, and not an individual lender, may act is impossible when applied to some of that section's subdivisions, notably section 8.3 (c), authorizing the Administrative Agent to "commence, appear in and/or defend any action . . . brought by or against the Borrower or the Lenders."

Similarly, section 9.1 of the Credit Agreement, saying that "[e]ach Lender authorizes the Administrative Agent to act on behalf of such Lender," means just what it says: it is an authorization, not an exclusion. If the authors of the document meant the authorization to be exclusive, the words with which to say

so were readily available. Nor is it significant that, in an obvious attempt to avoid reciting a lengthy list, the Credit Agreement "names the Administrative Agent but refers to the Lenders as 'Various Financial Institutions' without naming them" (majority op at 329).

In short, I think it clear that nothing in these agreements deprives the lenders of their rights to sue separately. I would reach this conclusion even if the Credit Agreement did not say, as it does in section 10.20: "No right or remedy conferred upon the Administrative Agent . . . in this Agreement is intended to be exclusive of any other right or remedy contained in the other Loan Documents or at law and equity." Surely this language should remove all doubt about the matter.

The *Commercial Bank* and *New Bank* cases, cited above, show that a provision in a loan agreement authorizing an agent to act upon direction of a specified number of lenders does not defeat the rights of lenders to act for themselves to collect their loans. The Second Circuit Court of Appeals said in *Commercial Bank*: "While the participation agreement . . . authorizes the 'Confirming Bank' to sue 'only if requested to do so by the Majority Banks,' this provision does not abrogate the rights of participating banks to sue on their own" (15 F3d at 243). That observation is squarely applicable here; the majority has identified no important distinction between the language at issue in *Commercial Bank* and the language it relies on.

The majority mistakenly cites *New Bank* as supporting its position (majority op at 326), because *New Bank* held that a right under a loan agreement to accelerate loan payments was enforceable only by collective action; but that issue is not the one we have in this case. A right of acceleration, unlike the basic right to sue for money that is already due, does not exist except to the extent that a contract provides for it. The *New Bank* court itself pointed out this distinction: "although acceleration and foreclosure are contractual remedies which may not be exercised without a majority vote of the Lenders, NBNE is free to pursue its own remedies at law by suing Noble to collect on its debt to NBNE" (768 F Supp at 1023). Beal should be no less free to pursue its own collection remedy here.

The majority relies on two decisions by trial-level courts, *Credit Francais Intl. v Sociedad Fin. de Comercio* (128 Misc 2d 564 [Sup Ct, NY County 1985]) and *In re Enron Corp.* (302 BR 463 [Bankr Ct SD NY 2003], *affd* 2005 WL 356985, 2005 US

Dist LEXIS 2134 [SD NY 2005]). To the extent these decisions are relevant to our case, I do not find either convincing; I agree with Justice Klein's, rather than Justice Greenfield's, interpretation of the contract in *Credit Francais* (*see* 128 Misc 2d at 575), and I think Judge Gonzalez's conclusion in *Enron* is more strongly supported by his alternative holding (*see* 302 BR at 476). (Indeed, the successful parties in *Enron* conceded on appeal that the lenders in that case retained some rights to sue under their loan agreement, and Judge Gonzalez's ruling was affirmed on grounds not relevant here [*see* 2005 WL 356985 at *7-8 and n 36, 2005 US Dist LEXIS 2134 at *30-33 and n 36].) But even if both Justice Greenfield and Judge Gonzalez were correct, that would not mean Beal cannot sue in this case. Both judges relied on contractual language giving rights to the agent that is stronger than any language we have here (*see* 128 Misc 2d at 578 ["Each Depositor . . . irrevocably authorizes the Agent . . ."]; 302 BR at 471-472 [referring to several instances in which the agent was "irrevocably authorized" to act]).

The majority's reading of the Credit Agreement here is less plausible than those given to the agreements in *Credit Francais* and *Enron* for another reason: while the agreements in those cases permitted the agent to act with the approval of a majority in interest of the lenders, the Credit Agreement here requires two thirds. Thus if, as the majority holds, the Credit Agreement and the Keep-Well Agreement are enforceable only by the Administrative Agent, dissenting lenders holding 33.4% of the loan can render those agreements unenforceable. It is most unlikely that the lenders who signed the Credit Agreement thought that they would be powerless to recover their loans if a minority of lenders were unwilling to take action.

Of course, in this case, the lenders unwilling to sue are not a dissident faction. They hold, as the majority mentions repeatedly, 95.5% of the debt, and have made an arrangement that every lender except Beal is willing to go along with. It is this fact that makes the result the majority reaches attractive: intuitively, it seems that if 36 out of 37 lenders are satisfied with a deal, the 37th should not be allowed to upset the applecart.

But Beal would fare no better under the majority's reasoning if it were one of a group with a 66.6% interest. There is no possible distinction, under the agreements in suit, between Beal and any other holder or holders who have less than two thirds of the loan. Thus the majority's decision, while reaching a

pragmatically appealing result, essentially reads into the loan documents language that would compel results far less appealing. These agreements are complex, and were no doubt negotiated by experienced counsel. Fairness to these parties, and the confidence with which future parties enter similar transactions, would be better served by reading the agreements as they are written.

Judges CIPARICK, GRAFFEO and PIGOTT concur with Chief Judge KAYE; Judge SMITH dissents in a separate opinion; Judges READ and JONES taking no part.

Order affirmed, with costs.