OPINION OF THE COURT
Richard M. Platkin, J.
In this action premised on alleged violations of General Business Law §§ 349 and 350, common-law fraud and negligent misrepresentation, defendant Albany Law School of Union University (ALS) moves pursuant to CPLR 3211 (a) (1) and (7) for dismissal of the amended complaint.
Background
In February 2012, three recent graduates of ALS commenced this action on behalf of themselves and others similarly situated. An amended class action complaint (complaint) was filed in May 2012, which added a fourth recent graduate as plaintiff. According to the complaint, Matthew Austin graduated from ALS in 2010 and has practiced law in temporary or contract positions in Monroe County since November 2010 (1i 9). Jordan Haug graduated from ALS in 2011, recently passed the New York State bar examination and secured temporary employment at a law firm in November 2011. Holly Pennington graduated in 2011, worked as a clerk for a law firm until January 2012 and took the bar exam in February 2012. Andrew Dructor, a 2010 graduate who resides in Pennsylvania but is admitted to the New York bar, alleges that he has been unable to obtain permanent, full-time legal employment.
Common to all four plaintiffs are allegations that they
“paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars more in debt. In applying and deciding to remain enrolled at Albany Law, [plaintiffs] relied on salary data and employment information posted on ALS’s website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and US News, and specifically relied on ALS’s representations that, depending on the year, approximately 95 percent of its graduates were employed within nine months of graduation. Indeed, prior to [plaintiffs] enrolling in Albany Law, the school represented that about 97 percent of 2006 graduates secured employment within nine months of graduation, and while Mr. *991 Haug was enrolled in Albany Law the school posted on its website an employment report asserting that 94 percent of 2008 graduates secured employment within nine months of graduation. Furthermore, [plaintiffs] when applying and deciding to remain enrolled in Albany Law w[ere] unaware that the school’s reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred— employment [plaintiffs] would have been eligible for even without obtaining a JD degree and paying ALS’s tuition. Had [plaintiffs] been aware that ALS’s reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, [they] would have elected to either pay less to Albany Law or perhaps not attend the school at all” (complaint 1f1T 9-12).
The complaint focuses on graduate employment data published by ALS on its Internet website and in its marketing materials. Plaintiffs allege that ALS currently represents on its website that 91% of the class of 2010 was employed nine months after graduation, with 71% working in positions for which a juris doctor (JD) is required, 19% in positions for which a JD is preferred and 10% in positions that neither require nor prefer a JD (complaint If 21). According to plaintiffs, these figures are based upon “unaudited, unverified and self-reported” data (id.).
Plaintiffs further allege that prior to September 2011, ALS “disclosed even less accurate and more deceptive information regarding [its] graduates’ job prospects, by failing to disclose the percentage of graduates who were in jobs that do not require or prefer a JD degree” (id. If 22).
“For example, for the class of 2009, the school posted employment data which claims that the employment rate was 90 percent, including 45 percent of the class allegedly working in private practice, 20 percent working for ‘corporations,’ 27 percent working in government, five percent in public interest, and five percent in ‘academia.’ For the class of 2008, the school claimed an employment rate of 94 percent, including 49 percent in private practice, 19 percent in ‘business,’ 16 percent in government, six percent in public interest and two percent in academia” (id. [citation omitted]).
*992 Additionally, plaintiffs allege that ALS disseminated false or misleading employment information to third parties, including U.S. News & World Report (US News), the American Bar Association (ABA) and the National Association for Law Placement (NALP). The complaint explains that US News and the ABA “simply require law schools to report an overall employment number, and do not require schools to distinguish between part-time and full-time jobs” (11 24). The complaint further articulates that as an accredited law school, ALS is required “by Section 509 (a) of the ABA’s 2010-2011 Standards for Approval of Law Schools . . . [to] ‘publish basic consumer information’ in a ‘fair and accurate manner reflective of actual practice’ ” (id. 1118). According to plaintiffs, ALS and other “law schools would satisfy th[e ABA’s] virtually meaningless and non-existent criterion by reporting jobs that are temporary or part-time or have absolutely nothing to do with obtaining a JD degree as ‘employment’ ” (id.).
In contrast, NALP requires a
“specifict ] break down [of] the exact type of employment their graduates have obtained, differentiating between part-time and full-time jobs or whether a position requires a JD degree. Unfortunately, NALP does not either publish or make available to the public these questionnaires, and instead compiles and tabulates their data into a single document which contains aggregate statistical information from all law schools” (id. 1f 26).
Plaintiffs complain that despite ALS “breaking down its employment data into various disaggregated categories for NALI] the school presented highly misleading [aggregated] data to prospective and current students” (id. 1f 27).
The complaint also alleges that the employment data reported and marketed by ALS is “grossly inflated” due to the inclusion of the following types of employment within the aggregate percentage figure published by the law school: (a) positions for which a JD is not required or preferred; (b) part-time or temporary positions; (c) research assistants and fellows funded by the law school; (d) graduates who were employed within nine months of graduation, but who were not employed on the reporting date of the survey; and (e) graduates who have been “forced” to start solo practices due to their inability to find other employment (complaint H 29). Plaintiffs also complain that “Albany Law . . . calculates and tallies the raw data input *993 ted in the job surveys filled out by recent graduates in a shoddy, slipshod manner, cynically choosing to omit or ignore critical statistical data that would substantially lower placement rates” (id.).
In support of their contention that the employment statistics published by ALS are “demonstrably false,” the complaint relies upon allegations that: (1) the school’s reported employment rates have remained “eerily steady” despite the overall downturn in the legal market following the “Great Recession” of 2008, “leaving the misimpression that the value of an ALS degree is ‘recession proof (2) the employment data published by ALS is “at odds” with the statistics reported to NALP; (3) published employment rates failed to consider the surplus of attorneys in the market; and (4) academic and consulting research indicates that the “true” percentage of law school graduates that obtain full-time, permanent legal employment is only 40% (id. 1111 5, 31).
Against this backdrop, the complaint sets forth four causes of action. First, plaintiffs allege that ALS violated General Business Law § 349 by “engaging] in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts” (id. 11 46). Among the alleged actionable misrepresentations and omissions are: (1) false statements that 90% or more of ALS graduates secure employment within nine months of graduation; (2) the manipulation of “post-graduate employment data, so as to give the appearance that the overwhelming majority of recent graduates secure full-time, permanent employment for which a JD degree is required or preferred”; and (3) the dissemination of false employment data to third parties (id.). In this connection, plaintiffs allege that they (and others similarly situated) “enrolled at Albany Law for the purpose of securing . . . full-time, permanent employment for which a JD degree is required or preferred” and that the challenged representations or omissions therefore were material to their “decision to enroll and attend Albany Law, and further proximately caused [them] to pay inflated tuition” (id. 1i 47).
The same factual allegations form the basis of the remaining causes of action, which allege violations of General Business Law § 350, common-law fraud and negligent misrepresentation. With respect to the latter two claims, plaintiffs maintain that they justifiably relied upon ALS’s alleged misrepresentations and omissions, which are said to be “part of a common scheme, *994 practice and plan conceived and executed by Albany Law to mislead, deceive and defraud” current and prospective students (id. 1Í1Í 61, 69). Relatedly, plaintiffs allege that ALS occupies a fiduciary position as an educator — an allegation central to plaintiffs’ contention that ALS owed them an affirmative duty of disclosure (id. H1i 63, 71).
On the basis of the foregoing allegations, plaintiffs demand the following relief: an injunction restraining ALS “from continuing to engage in their unlawful recruitment program and manipulation of post-graduate employment data”; class certification; “the partial restitution and disgorgement of tuition monies remitted to Albany Law, totaling $50 million, which is the difference between the inflated tuition paid by Class members . . . and the true value of an ALS degree”; monetary damages, including consequential and punitive damages; an accounting; and an injunction requiring ALS to retain “unrelated, independent third-parties to audit and verify post-graduate employment data and salary information” (id. wherefore clause).
ALS moved to dismiss the complaint prior to answering pursuant to CPLR 3211 (a) (1) and (7).[1] Oral argument was held on October 19, 2012. This decision and order follows.
Analysis
ALS moves for dismissal of plaintiffs’ complaint pursuant to CPLR 3211 (a) (1) and (7). “Under CPLR 3211 (a) (1), dismissal is warranted if documentary evidence conclusively establishes a defense as a matter of law” (Haire v Bonelli, 57 AD3d 1354, 1356 [3d Dept 2008], citing Beal Sav. Bank v Sommer, 8 NY3d 318, 324 [2007]; see Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326 [2002]). On a motion pursuant to CPLR 3211 (a) (7), the court’s “sole criterion is whether the pleading states a cause of action” (Polonetsky v Better Homes Depot, 97 NY2d 46, 54 [2001]). In making this determination, “the court must afford the pleadings a liberal construction, take the allegations of the complaint as true and provide plaintiff the benefit of every possible inference” (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]; see Ovitz v Bloomberg L.P., 18 NY3d 753, 758 [2012]; Leon v Martinez, 84 NY2d 83, 87-88 [1994]).
*995 A. General Business Law § 349
General Business Law § 349 “declares unlawful ‘[deceptive acts or practices in the conduct of any business’ ” (City of New York v Smokes-Spirits.Com, Inc., 12 NY3d 616, 621 [2009], quoting General Business Law § 349 [a]). “To successfully assert a section 349 . . . claim, a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice” (id. at 621-622).
In moving for dismissal of the complaint, ALS first contends that the employment data it published and disseminated was not false or misleading. Under the objective standard of General Business Law § 349, the challenged representation or omission must be one that is “likely to mislead a reasonable consumer acting reasonably under the circumstances” (Stutman v Chemical Bank, 95 NY2d 24, 29 [2000]; see Gaidon v Guardian Life Ins. Co. of Am., 94 NY2d 330, 344 [1999]; Oswego Laborers’ Local 214 Pension Fund v Marine Midland Bank, 85 NY2d 20, 26 [1995]). The “reasonable consumer test” may be determined as a matter of law in appropriate cases (see Oswego Laborers’ Local 214 Pension Fund, 85 NY2d at 26).
Here, the alleged deceptive acts or practices are directed principally at college graduates deciding whether to pursue a legal education at ALS (see complaint 1Í1Í 9-12). These individuals are called upon to decide whether to pursue a legal education and, if so, which law school to attend. While highly consequential in their own right, these decisions generally are intertwined with an individual’s choice of career. Thus, in considering a reasonable consumer acting reasonably under the circumstances, the court is mindful that it is deeding with a reasonably well-educated (though not necessarily sophisticated) group of consumers who are called upon to make major life decisions. As such, this case is unlike those involving representations made to the general public in connection with the sale of modestly priced consumer goods (cf. Guggenheimer v Ginzburg, 43 NY2d 268, 273 [1977] [sale of dictionary]).
With respect to the challenged representations, plaintiffs do not (and cannot) seriously contend that ALS’s published employment rates literally are false. While the complaint makes passing reference to actual falsity, it is clear that plaintiffs’ allegation of “grossly inflated” employment rates is premised upon ALS’s use of an aggregated statistic that includes compensated positions other than “full-time, permanent employment for *996 which a JD degree is required or preferred” (see complaint If 47; see id. If 29). Further, while the complaint generally adverts to ALS’s negligence in tabulating, calculating and tallying the raw data used to compile the school’s published employment statistics (id. 1Í 29), there are no specific factual allegations supporting the conclusion that the “employment” rate published by ALS is false within the literal meaning of such term (see Black’s Law Dictionary [9th ed 2009], employment [“employment” is “(w)ork for which one has been hired and is being paid”]).
Rather, plaintiffs argue principally that the employment data published by ALS is deceptive and materially misleading because it creates the false impression “that the overwhelming majority of [the school’s] graduates are gainfully employed” through the inclusion of “temporary and part-time employment and/or employment for which a JD was not required or preferred” (complaint 1Í1I 4-5, 9-12, 18, 22, 27, 28-29). In other words, plaintiffs take issue with ALS’s publication of statistics that “count as ‘employed’ those who have secured employment in any capacity in any kind of job” (id. If 5).
However, the challenged representations merely are unadorned percentages of recent ALS graduates who are “employ [ed]” (see e.g. exhibit 1 [“graduate employment rate of 91 percent”]; exhibit 3 [“employment rate for graduates!:) 88%”]; exhibit 5 [“97%: Employment Rate for Albany Law School”]). Nowhere is it stated or implied that these figures represent anything other than the percentage of recent graduates who obtained “employment,” as such term commonly and ordinarily is understood (see MacDonald v Thomas M. Cooley Law Sch., 2012 WL 2994107, *6, 2012 US Dist LEXIS 100785, *20 [WD Mich, July 20, 2012, No. 1:11-CV-831] [“The statistic descriptor does not differentiate between part-time, full-time, legal, or non-legal jobs”]). There simply is nothing in the challenged representations that would lead reasonable consumers acting reasonably to believe that ALS’s published “employment” rate carved out compensated positions for which a JD is not required or preferred, part-time employment, temporary employment, contract employment, postgraduate fellowships, research assistantships and/or certain types of solo legal practices (see complaint 1Í 29). In fact, “ ‘basic deductive reasoning,’ informs a reasonable person that the employment statistic includes all employed graduates, not just those who obtained or started full-time legal positions” (Thomas M. Cooley, 2012 WL 2994107, *7, *997 2012 US Dist LEXIS 100785, *21 [emphasis added and citation omitted]).
Indeed, given the elaborate and somewhat subjective nature of plaintiffs’ definition of “employment,” it is difficult to envision how they could reasonably have expected any single published statistic to comport with all of their assumptions and expectations regarding legal employment. For example, plaintiffs would exclude from “employment” those law school “graduates who have been forced to start solo practices due to their inability to secure any type of employment and have earned little or no money” (complaint 1f 29 [e]). Thus, in deciding whether to count a solo practitioner as “employed,” plaintiffs would have the law school apply a multifactor test requiring individualized consideration of the extent to which starting a solo practice was the graduate’s preference, the other employment options available to the graduate, and the financial success of the graduate’s new venture.
The court is not persuaded that General Business Law § 349 requires an institution such as ALS to ascertain these types of individualized needs and guarantee that its published employment statistics suit each prospective or current student. Nor would it be reasonable for students to read all of their hopes and aspirations concerning the practice of law into the unadorned employment rate published by ALS. Rather, insofar as plaintiffs’ decision to attend ALS turned on an employment rate limited to positions for which a JD is required or preferred, it was incumbent upon plaintiffs to ascertain whether ALS’s published data fit their particular assumptions and met their specific needs.
In this connection, plaintiffs allege that they reviewed the ALS employment data disseminated to third parties (complaint lili 9-12), but lament “there is no place where prospective students can find Albany Law’s ‘real’ employment numbers” (id. If 4). While it is true that disaggregated employment data for ALS generally was not available for much of the period at issue in this action, examination of the highly disaggregated categories of employment data compiled by NALP (id. 1Í1Í 26-27; see exhibit 6) and the considerable variance between NALP’s national percentage of law school graduates employed in positions for which a JD is required or preferred and the employment data published by ALS (which includes a comparison to national averages) would have made it apparent that ALS was publishing an aggregated rate. To similar effect are ALS’s refer *998 enees to its graduates working in sectors such as business or government, where many alumni are well and gainfully employed in positions for which a JD is neither required nor preferred, including many ALS graduates who serve in state government.
Contrary to plaintiffs’ contention, the foregoing is not directed at the issue of reliance. Plaintiffs need not demonstrate reliance, reasonable or otherwise, to succeed on their General Business Law claims. However, the objective standard of General Business Law § 349 requires the court to consider whether the challenged representations would deceive a reasonable consumer acting reasonably under the circumstances. Reasonable college graduates grappling with major life decisions concerning a career and the pursuit of a professional degree would not read a host of assumptions about legal employment into the unembellished “employment rate” published by ALS without confirming that this summary statistic fit their specific needs.
Similar considerations are fatal to plaintiffs’ argument that ALS’s failure to disclose disaggregated employment data is itself a deceptive or misleading practice. An institution has no duty “to ascertain consumers’ individual needs and guarantee that each consumer has all relevant information specific to its situation” (Oswego Laborers’ Local 214 Pension Fund, 85 NY2d at 26), particularly where the limitations associated with the published information can be ascertained through the exercise of reasonable diligence (see supra at 997). And unlike Oswego, this case does not concern disclosure of the terms of the particular transaction (85 NY2d at 26). Nor is this a case like Gotlin ex rel. County of Richmond v Lederman (483 Fed Appx 583 [2d Cir 2012]), where the defendants were alleged to have adopted a definition of medical “success” that encompassed failed procedures. ALS relies upon the commonly understood meaning of the term “employment,” and it is the plaintiffs who seek to add a layer of gloss to the term reflective of their particular hopes, aspirations and expectations regarding legal employment.
Accordingly, even viewing the allegations of the complaint in a light most favorable to plaintiffs and giving them the benefit of all reasonable inferences, as the court must do at this early stage of the litigation, ALS’s publication of aggregated “employment rates” cannot be considered deceptive or misleading to a reasonable consumer acting reasonably under the circumstances. This conclusion is in accord with the recent decision of *999 the Appellate Division, First Department, in Gomez-Jimenez v New York Law Sch. (103 AD3d 13 [2012], affg 36 Misc 3d 230 [Sup Ct, NY County 2012]), which, in any event, is binding upon this court (see generally Matter of Patrick BB., 284 AD2d 636, 639 [3d Dept 2001]; Mountain View Coach Lines v Storms, 102 AD2d 663, 664 [2d Dept 1984]).
In view of the foregoing, the court has no occasion to reach ALS’s argument that General Business Law § 349 (d) provides a complete defense to plaintiffs’ claim. Likewise, the court need not delve into ALS’s contention that plaintiffs have failed to allege a viable measure of damages, an argument that is in any event flawed in the context of General Business Law § 349 (h) due to the availability of nominal statutory damages.[2]
B. General Business Law § 350
“ ‘The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349’ ” (Denenberg v Rosen, 71 AD3d 187, 194 [1st Dept 2010], Iv dismissed 14 NY3d 910 [2010], quoting Goshen, 98 NY2d at 324 n 1). Accordingly, for the reasons stated above, the General Business Law § 350 claim must be dismissed due to the absence of any materially misleading conduct on the part of ALS.
C. Common-Law Fraud
“ ‘The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and *1000 damages’ ” (Maki v Bassett Healthcare, 85 AD3d 1366, 1369 [3d Dept 2011], appeal dismissed 17 NY3d 855 [2011], quoting Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 559 [2009]). For the reasons stated above, plaintiffs cannot establish that ALS’s representations regarding its published employment rates were false (or materially misleading).
As to the branch of the fraud claim founded upon allegations of concealment, settled law holds that such a cause of action will lie only where “the defendant had a duty to disclose” (Kaufman v Cohen, 307 AD2d 113, 120 [1st Dept 2003]). Such a duty may arise where a fiduciary relationship exists (see id.; see also Paolucci v Mauro, 74 AD3d 1517, 1520 [3d Dept 2010]). However, as ALS correctly asserts, the relationship between an institution of higher education and its students is contractual, rather than fiduciary, in nature (see e.g. Moy v Adelphi Inst., Inc., 866 F Supp 696, 708 [ED NY 1994]; Baldridge v State of New York, 293 AD2d 941, 942-943 [3d Dept 2002], Iv denied 98 NY2d 608 [2002]; Sweeney v Columbia Univ., 270 AD2d 335, 336 [2d Dept 2000]). Moreover, a school’s relationship with prospective students is even more attenuated. Accordingly, there is no fiduciary relationship here that would give rise to a duty of disclosure.
Absent the existence of a fiduciary relationship, “a duty to disclose arises only under the ‘special facts’ doctrine where ‘ “ ‘one party’s superior knowledge of essential facts renders a transaction without disclosure inherently unfair’ ” ’ ” (Jana L. v West 129th St. Realty Corp., 22 AD3d 274, 277 [1st Dept 2005]; Swersky v Dreyer & Traub, 219 AD2d 321, 327 [1st Dept 1996]). For this doctrine to apply, plaintiffs must establish that the information was “peculiarly within [the] knowledge of [ALE], and . . . was not such that could have been discovered by [plaintiffs] through the exercise of ordinary intelligence” (Jana L., 22 AD3d at 278 [internal quotation marks omitted]). Here, plaintiffs’ reliance on the special facts doctrine is unavailing because they could have ascertained the true nature of the employment statistics published by ALS and the limitations associated therewith through the exercise of reasonable diligence (see supra at 997; see also complaint 1Í1Í 9-12 [alleging that plaintiffs reviewed all third-party data]).[3]
*1001 Moreover, even if there was a duty to disclose, under the special facts doctrine or otherwise, plaintiffs could not have justifiably relied upon the omission of disaggregated employment data as a basis for assuming that the unadorned employment rate published by ALS fit their particular definition of “employment.”
Accordingly, the court concludes that the fraud claim must be dismissed (accord Gomez-Jimenez).
D. Negligent Misrepresentation
Finally, “[a] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information” (J.A.O. Acquisition Corp. v Stavitsky, 8 NY3d 144, 148 [2007]; see Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 180 [2011]). For the reasons stated above, this claim fails insofar as it is premised upon allegations that ALS disseminated false or misleading information. Further, to the extent that the claim is based upon ALS’s alleged concealment of information, it fails due to the absence of a special relationship. ALS presented material to prospective students in a broad, generalized format, and there are no allegations that ALS fostered a special relationship with plaintiffs or provided them with personalized information (see Mandarin Trading Ltd., 16 NY3d at 180-181). And, in any event, plaintiffs cannot establish reasonable reliance. Accordingly, the cause of action for negligent misrepresentation also must be dismissed (accord Gomez-Jimenez).
Conclusion
Based on the foregoing, the court concludes that ALS’s motion to dismiss the complaint must be granted in all respects. Accordingly,[4] it is ordered that the motion by defendant Albany Law School of Union University is granted, and the complaint is dismissed in its entirety.

. ALS’s pre-answer motion was filed in response to the original complaint, but the parties have stipulated that the motion should be deemed to be directed at the amended complaint.

. While plaintiffs pay lip service to a “price inflation” theory of damages, contending that ALS’s deceptive employment statistics caused them to pay inflated tuition (see Small v Lorillard Tobacco Co., 94 NY2d 43, 56 n 5 [1999]), it is apparent that plaintiffs actually are seeking damages based upon an alleged diminution in the “true value” of their degrees (complaint wherefore clause [3] [“difference between the inflated tuition paid . . . and the true value of a ALS degree”]; see id. 1I1[ 5, 31 [a]; mem of law in opposition at 18 [expert valuation of degrees]). Even assuming that the “true value” of an ALS degree could be ascertained with reasonable certainty, a point that seems doubtful (see Gomez-Jimenez, 36 Misc 3d at 248), weighing the tuition charged by ALS against the value of the resulting degree is an apples to oranges comparison that impermissibly seeks to inject a “benefit of the bargain” theory of damages into the case. Further, the notion that an educational degree has a value independent of the enhanced earning capacity that it offers to a particular individual is misplaced. It also bears emphasis here that the court is not analyzing a commercial transaction whereby plaintiffs purchased degrees from ALS. Insofar as we are constrained to speak in the language of consumer transactions, plaintiffs paid ALS for the opportunity to acquire a legal education, the successful completion of which is evidenced by a degree. There is no allegation that plaintiffs’ legal education has been diminished or devalued in any way by the alleged deceptive practices.

. Likewise, information concerning the changing nature of the practice of law in this day and age, the economic realities facing the legal profession and *1001 the impact of downward economic cycles upon the short-term employment market for new attorneys also was available to plaintiffs through the exercise of reasonable diligence.

. The court has considered the parties’ remaining arguments and contentions but finds them unavailing or unnecessary to the disposition ordered herein.